**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.:

CHRISTOPHER KAIN, Individually and on Behalf of All Others Similarly Situated,

        Plaintiff,

    v.

AMPIO PHARMACEUTICALS, INC.,
MICHAEL A. MARTINO,
MICHAEL MACALUSO, and
HOLLI CHEREVKA,

        Defendants.

---

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS AND JURY TRIAL DEMAND**

---

      Christopher Kain, by and through his counsel, alleges the following upon information and belief, except as to those allegations concerning plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (i) regulatory filings made by Ampio Pharmaceuticals, Inc. ("Ampio" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases, presentations, and media reports issued by and disseminated by the Company; (iii) analyst and media reports concerning Ampio; and (iv) other public information regarding the Company.

## <u>INTRODUCTION</u>

      1.    Plaintiff brings this securities class action on behalf of all persons or entities that purchased or otherwise acquired Ampio common stock between December 29, 2020 and August

3, 2022, inclusive (the "Class Period").

2.      The claims asserted herein are alleged against Ampio and certain of the Company's senior executives, and arise under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, promulgated thereunder.

3.      Through various filings with the SEC, Ampio claims to have developed Ampion®, its lead product with "unique immunomodulatory action and anti-inflammatory effects" used to treat individuals with inflammatory conditions including, but not limited to, severe osteoarthritis of the knee ("OAK").  The Company further asserts that "Ampion is currently in development as an intra-articular injection treatment for severe OAK, an intravenous and inhaled treatment for hospitalized severe and/or critical COVID-19 patients, and an at-home inhalation treatment for patients with prolonged respiratory symptoms due to COVID-19, commonly referred to as "Long-COVID."

4.      Beginning in 2010 and lasting through approximately March 2022, Ampio conducted numerous clinical trials and analyses to determine Ampion's efficacy.  Despite confidently advertising on numerous occasions that Ampion demonstrated a statistically significant decrease in pain associated in symptomatic moderate-severe OAK, the Company failed to bring Ampion to market.

5.      After months of delay and analyst speculation of the effectiveness of Ampion, on May 16, 2022, the Company announced that it had formed a special committee of the Ampio Board of Directors (the "Board") was conducting internal investigations focusing specifically on the statistical analysis of Ampio's AP-013 clinical trial and unauthorized provision of Ampion which had not yet been approved by the U.S. Food and Drug Administration ("FDA").

6.     Then, in premarket hours on August 3, 2022, Ampio issued a press release containing a letter to stockholders revealing that the Individual Defendants (as defined herein) "and senior staff were aware, at the time of the per-protocol interim analysis in March 2020, that the AP-013 trial did not demonstrate efficacy for Ampion on its co-primary endpoints of pain and function; and that these persons did not fully report the results of the AP-013 trial and the timing of unblinding of data from the AP-013 trial."  On this news, the Company's share price dropped $0.06, or 35.38%, from the previous day's close, on greater than usual trading volume.

7.     Due to defendants' wrongful acts and omissions, and the precipitous declines in the market value of the Company's shares alleged herein, plaintiff and other Class (as defined below) members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §78j(b) and §78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §1337, and section 27 of the Exchange Act, 15 U.S.C. §78aa.

10.     Venue is proper in this District under 28 U.S.C. §1391(b), and section 27 of the Exchange Act, 15 U.S.C. §78aa, because Ampio's principal executive office is located in Englewood, Colorado, which is situated in this District, and many of the acts giving rise to the violations complained of in this action, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.

11.     In connection with the acts alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

**Plaintiff**

12.     Plaintiff Christopher Kain is a holder of Ampio common stock.  As indicated in the certification submitted herewith, plaintiff purchased Ampio stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the securities laws alleged herein.

**Defendants**

13.     Defendant Ampio is a Delaware corporation with principal executive offices located at 373 Inverness Parkway, Suite 200, Englewood, Colorado.  Ampio is a pre-revenue stage biopharmaceutical company focused on the research, development, and advancement of immunomodulatory therapies for the treatment of pain from osteoarthritis.  The Company's lead product candidate, Ampion, purportedly has unique immunomodulatory action and anti-inflammatory effects, which may provide a treatment for individuals with inflammatory conditions including, but not limited to, OAK, osteoarthritis related to other joints (i.e., hip, shoulder, ankle and hand), and the widespread inflammation associated with COVID-19 infection.  As of August 3, 2022, Ampio had eighteen employees.

14.     Defendant Michael A. Martino ("Martino") has been Ampio's Chief Executive Officer ("CEO") since November 2021 and a director since October 2021.

15.    Defendant Michael Macaluso ("Macaluso") was Ampio's Advisor to the CEO from November 2021 to May 2022; a director from March 2010 to May 2022; CEO from January 2012 to November 2021; and Chairman of the Board from May 2010 to November 2021.

16.    Defendant Holli Cherevka ("Cherevka") was Ampio's President from October 2021 to May 2022; Chief Operating Officer from September 2017 to May 2022; Vice President of Operations from May 2015 to September 2017; Senior Director of Clinical Trials from November 2013 to May 2015; and Director of Clinical Trails from January 2013 to November 2013.

17.    Defendants Martino, Macaluso, and Cherevka are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Ampio's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.   The Individual Defendants were provided copies of the Company's reports and press releases alleged in this complaint to be misleading before, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material nonpublic information available to them, the Individual Defendants knew that the adverse facts and omissions specified in this complaint had not been disclosed to, and were being concealed from, the public, and that positive representations and omissions which were being made were then materially false and misleading.

## THE CLINICAL HISTORY OF AMPION

18.    On November 12, 2010, Ampio filed its Registration Statement on Form S-1 with the SEC.  The Registration Statement announced the Company's generation of a lead product candidate, Ampion, an investigational new drug ("IND"), which was being developed as a new molecular entity ("NME") for inflammatory diseases.  Ampio further stated that it planned to

conduct four proof of concept studies of the NME in India or Australia, the Phase I/II trials.  The cost for each trial was expected to be under $0.5 million and to begin in the second or third quarter of 2011 with an estimated completion time of twenty-four months.

19.     In addition to the four proof of concept studies, in late 2010, Ampio announced they were preparing to seek approval for a Phase II double-blind, placebo-controlled clinical study of Ampion for the treatment of chronic inflammatory and autoimmune disease.  The Phase II clinical trial was estimated to take between eighteen to twenty-four months to complete.

20.     On October 28, 2011, the Company issued a press release announcing the results of its Ampion-In-Knee Australian clinical trial.  In particular, the press release quoted defendant Macaluso as stating:

> In this first ever trial of Ampion™ in humans the drug was shown to be well tolerated and reduced pain over and above steroids. As a result of this study, Ampion™ will now be tested as a stand-alone therapy, which was not previously permitted by the regulators, and the company is immediately expanding the trial to include two additional arms (Ampion™ alone vs. saline alone). The combined results will enable comparison of Ampion™ directly with the standard of care (lidocaine/steroid) and a placebo control. The completion of this expansion will allow Ampio to augment the data that will be presented to the FDA.

21.     By June 12, 2012, Ampio announced that just one month earlier on May 10, 2012, the Company had completed a pre-IND meeting with the FDA and an agreement had been reached on the design of a US clinical trial for Ampion to treat OAK.

22.     Later that year, on November 14, 2012, the Company disclosed that it had received conduct guidance from the Center for Biologics Evaluation and Research ("CBER") division of the FDA regarding both open label and placebo-controlled trials which would be conducted over the next year to determine patient exposure for safety and clinical efficacy data.

23.     In April 2013, Ampio received FDA acceptance of its IND to treat OAK in fifteen patients (the Phase III "Spring Study" also known as "AP-003-A"), which resulted in positive

results.  Ampio's press release issued on August 14, 2013, stated that not only were all primary study objectives achieved, but that the Spring Study met primary endpoints with "[h]igh [s]tatistical [s]ignificance."

24.      By December 2, 2013, the Company had issued another press release announcing that it received FDA correspondence confirming the acceptance of the Spring Study as pivotal and that the FDA provided guidance for the design of the second and final trial of Ampion for the treatment of OAK which was slated to begin in early January 2014.  The success of the trial would eventually determine the outcome of Ampio's Biologics License Application ("BLA"), which would permit the Company to produce, manufacture, and sell Ampion to customers on the open market.

25.      The second pivotal trial, known as the Phase III "Stride Study" or "AP008" was completed in early 2015.  However, unlike AP-003-A, the Stride Study did not reach its primary endpoint "even though there was a statistically significant reduction in pain compared to baseline for patients receiving Ampion."

26.      The failure of AP008 led Ampio and the Individual Defendants to scramble.  After all, Ampion was the Company's lead drug candidate, which was meant to boost the development stage biopharmaceutical company to hopefully start earning revenue and stop operating at a loss.

27.      In July 2015, the Company held an investor call announcing its meeting with the FDA.  During the conference call, the Individual Defendants disclosed that Ampio agreed to a Special Protocol Assessment ("SPA") which is a written agreement that outlines the design and size of a clinical trial to form the primary basis of efficacy for a BLA filing.  The terms of the SPA required that Ampio complete a second Phase III pivotal trial of Ampion (the "PIVOT trial").

28.     Upon commencement of the PIVOT trial on September 22, 2015, defendant Macaluso assured stockholders that "this second pivotal trial is clinically identical to the previously successful Spring Study, which was confirmed by the agency as one of the two pivotal trials required for approval" and "[w]ith positive results and an SPA, Ampion™ has a clearly defined path to market."

29.     While the Individual Defendants peddled that the PIVOT trial would be completed seamlessly, the results announced in June 2016 were shockingly conflicting.  Unlike the Spring Study and more similar to the Stride Study, the PIVOT trial did not meet its primary endpoint.

30.     This blow to Ampion led the Company to meet with the CBER division, yet again, in both September and December 2016 to seek guidance on Ampio's path to obtaining a BLA. Over the next three years, Ampio struggled through the process of advancing through its late-stage clinical trials in the United States.

31.     Finally, in June 2019, the Company received *another* SPA from the FDA for an additional Phase III clinical trial titled "A Randomized, Controlled, Double-Blind Study to Evaluate the Efficacy and Safety of an Intra-Articular Injection of Ampion in Adults with Pain Due to Severe Osteoarthritis of the Knee" (the "AP-013 study").  According to the Company's Quarterly Report filed with the SEC on August 9, 2019, the initial proposed enrollment in AP-013 study was 724 patients, with an interim analysis, subject to sample size adjustments if required, but the FDA ultimately issued the SPA for 1,034 patients.

32.     Then, on March 24, 2020, at the recommendation of the Company's Safety Monitoring Committee, patient enrollment for the AP-013 study was closed as a result of the COVID-19 pandemic outbreak.  Less than a month later, the Company paused all activity relating to the AP-013 study.

33.     Unbeknownst to stockholders, despite bringing the AP-013 study to a complete halt, Ampio had already determined that the AP-013 study did not demonstrate efficacy for Ampion on its co-primary endpoints of pain and function.  Nevertheless, the Company and the Individual Defendants began disseminating false and misleading statements regarding the future of Ampion and its potential financial impact for Ampio stockholders.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

34.     First, on December 29, 2020, Ampio issued a press release regarding feedback it received from the FDA in response to the Company's proposed modifications to the SPA.  The Company claimed that the FDA permitted Ampio to "complete the [AP-013] study without re-running the trial" and that such options "give us the opportunity to provide additional evidence to support the use of existing data and/or add more patients to the trial."

35.     Then, during Ampio's fourth quarter and year-end 2020 earnings conference call held on March 3, 2021, defendant Cherevka knowingly made false claims regarding the effectiveness in Ampion's ability to reduce inflammation, stating: "In the laboratory, Ampion has been shown to uniquely reduce inflammation along multiple pathways, unlike other anti-inflammatory therapies that target only one pathway."

36.     After hours on May 5, 2021, the Company issued a press release touting a "[p]ositive FDA response provides guidance on multiple pathways forward on paused AP-013 Phase III trial in osteoarthritis of the knee (OAK)."  In addition, defendant Macaluso commented on the news, stating:

> This has been an important quarter for Ampio, with noted progress across our therapeutic platform. For example, the FDA has recently responded to our plans for the AP-013 Phase III trial for the intra-articular injection of Ampion for patients suffering from severe osteoarthritis of the knee (OAK). The response not only provides us with flexibility for maintaining the Special Protocol Assessment (SPA) but, in addition, allows us to consider several alternative paths forward to an

optimal solution that may include strategic discussions with potential partners for the commercialization, and expansion of osteoarthritis indications, of Ampion.

37.     On June 16, 2021, defendant Macaluso continued to issue positive statements regarding the effectiveness of Ampion.  Within Ampio's press release issued that day, he stated:

> Ampion is on track to become the first novel drug with unique mechanisms of action on the market for OAK in over 20 years. Ampion treatment has demonstrated consistent clinical efficacy in patients suffering from OAK across multiple trials, periods of time and clinical sites. In addition, the FDA has provided written confirmation that the AP-003-A study provides evidence of the effectiveness of Ampion....  We continue to remain confident the data from the suspended Phase III AP-013 trial will show similar safety and efficacy, but the decision whether to unblind this double masked, randomized controlled study or to continue adding patients ideally should be jointly decided with future potential partners.

38.     Then, on August 4, 2021, during Ampio's after-hours second quarter 2021 earnings conference call, defendant Macaluso announced that although they "have worked diligently with the FDA to gain better understanding of our viable options to preserve the study results to-date, which include keeping the special protocol assessment in place", they decided to unblind the data from the AP-013 study.   Defendant Macaluso defended the decision by saying that the purpose was to eliminate any bias from the pandemic and that the data would not be released until it had "been properly cleaned and validated" and "properly reflected into the database" as "a requirement of the FDA".  However, it was later discovered that the decision to unblind the trial was pre-emptively done without the FDA's permission.

39.     Despite the numerous setbacks relating to Ampion, on November 10, 2021, Ampio filed its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2021 with the SEC.  The Form 10-Q assured stockholders that the Company had $17.1 million of cash and cash equivalents providing them sufficient liquidity to fund operations through the first quarter of 2023.  In addition, the Form 10-Q stated: "While the Company believes that the studies currently being conducted will be successful, the Company expects to raise additional capital in both the

near and long-term to enable it to support its business operations, including specifically clinical development of Ampion and existing base business operations."

40.     During the Company's accompanying third quarter 2021 earnings conference call held that same day, defendant Cherevka continued to make false and misleading statements regarding the efficacy of Ampion.  In particular, defendant Cherevka stated that "in addition to providing evidence of safety and efficacy in pain and function, pre-clinical and early clinical studies have shown that Ampion impacts multiple genes related to repair and regeneration of cartilage.  These published findings suggest that Ampion treatment may prime stem cells for both mobilization and chondrogenic differentiation, potentially explaining some of the beneficial effects achieved in clinical trials with the Ampion treatment."

41.     Approximately three weeks later on December 1, 2021, Ampio held an after-hours Business Update conference call introducing defendant Martino as the Company's new Chief Executive Officer.   During the call, defendant Martino disclosed that the Company was appropriately applying FDA guidance to the AP-013 study.  However, just months later, this statement turned out to be untrue.

42.     On March 2, 2022, the Company announced that it had submitted a Type C meeting request to the FDA to meet with the CBER division regarding the development and review of Ampion, and that the FDA had confirmed such meeting.  Defendant Cherevka indicated that the FDA had recommended Ampio conduct a sensitivity analysis to determine if the COVID-19 pandemic affected the AP-013 study.  She further stated that "[t]his sensitivity analysis found a statistically significant impact from COVID-19, and as specified in our study plan, we have proposed a [modified Intent-To-Treat ("mITT")] population to assess efficacy."  Interestingly, Ampio's decision to unilaterally unblind the results of the AP-013 study based on a mITT was a

major modification that did not go unnoticed by the FDA.

43.     The above statements were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business operations and prospects. Specifically, defendants: (i) inflated the Company's true ability to successfully file a BLA for Ampion; (ii) inflated the results of the AP-013 study and the timing of unblinding the data from the AP-013 study; and (iii) that, as a result, of the foregoing, defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## THE TRUTH IS SLOWLY REVEALED

44.     After months of speculation the truth regarding the efficacy of Ampion for treatment of OAK began to unravel.  On April 20, 2022, the Company issued a press release providing a regulatory update that the FDA had responded negatively to its Type C meeting request.  In particular, the press release stated:

> FDA responded that it did not agree with the Company's proposed change from the ITT population to the mITT population for the primary endpoint analysis, that mITT is a substantive and material change to the Protocol and Statistical Analysis Plan that is not in accordance with the Special Protocol Assessment agreement, and that despite the COVID related impact on patients and trial centers, the Company should have sought FDA's agreement on these changes prior to analyzing and unblinding the data.  FDA further stated that it did not agree that AP-013 could serve as a second pivotal trial for Ampion based on both the change in the analysis population and the analysis of pain only instead of the original prespecified co-primary endpoints.

> "We are very disappointed in FDA's answer. Ampion has been in development for several years, and many shareholders have remained loyal to the company throughout the ups and downs of that development history. Severe osteoarthritis of the knee is an unmet medical need that affects nearly 17 million people in the United States, and we continue to believe that Ampion is a drug which can provide a safe and efficacious treatment for many of those patients. However, given the points in FDA's answer, it will be very difficult to salvage AP-013 itself as a pivotal trial. Nonetheless, we and our regulatory experts believe there may be ways to do that, and we will follow-up with the FDA in the near term to discuss those options,"

said Mike Martino Chief Executive Officer and Chairman of Ampio. "However, I want to be clear. At this point, I believe the best path forward for Ampio and Ampion is likely conducting a new Phase 3 trial. This management team has learned a great deal from conducting and analyzing the prior trials, including AP-013, and believe we are positioned to design and execute a trial that can lead to BLA approval."

45.    On this news, shares of Ampio stock plunged 26.47% from a close of $0.34 per share on April 20, 2022 to $0.25 per share on April 21, 2022.

46.    Then, in after-market hours on May 16, 2022, Ampio issued a press release announcing that an independent special committee of the Board (the "Special Committee"), with the assistance of independent legal counsel, was in the process of conducting an internal investigation relating to the AP-013 study.  The revelation of the internal investigation caused shares of Ampio stock to drop 10% from a close of $0.22 per share on May 16, 2022 to $0.18 per share on May 18, 2022.

47.    In the premarket hours on August 3, 2022, Ampio issued a press release containing a letter authored by defendant Martino and non-defendant Kevin Buchi, Chairman of the Board, to Ampio's stockholders (the "Stockholder Letter").  The Stockholder Letter reiterated that the basis of the previously announced investigation was primarily focused on: (i) the statistical analysis of Ampio's AP-013 study; and (ii) the unauthorized provision of Ampion for use by individuals not participating in clinical trials.

48.    After approximately three months of interviewing numerous individuals and reviewing documents and e-mails, the Special Committee's previously announced internal investigation was completed and its findings were damning.  More specifically, the Stockholder Letter revealed that the Individual Defendants "and senior staff were aware, at the time of the per-protocol interim analysis in March 2020, that the AP-013 trial did not demonstrate efficacy for Ampion on its co-primary endpoints of pain and function; and that these persons did not fully

report the results of the AP-013 trial and the timing of unblinding of data from the AP-013 trial."

49.     Furthermore, the Special Committee's investigation uncovered "that certain Ampio personnel, including a former executive officer and certain former directors, facilitated the provision of Ampion for unauthorized use."

50.     After trading as high as $2.76 per share on December 22, 2020, after the Stockholder Letter was issued, the Company's share price plummeted to close at $0.10 per share on August 3, 2022, a 96.25% drop, on unusually heavy trading value.

51.     As a result of these revelations, the Special Committee, through counsel, informed the SEC and the FDA of its findings.  Ampio also admits that after seven Phase II/III trials, comprising of more than 1,500 Ampion-treated patients and more than 1,400 saline-treated patients, "Ampion has simply not demonstrated a sufficient therapeutic benefit versus saline to support another superiority trial and a noninferiority trial versus saline would not be commercially competitive."

## LOSS CAUSATION

52.     During the Class Period, as detailed herein, defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of Ampio common stock and operated as a fraud or deceit on the Class.  Later, when the truth concealed by defendants' prior misrepresentations and omissions was disclosed to the market, including after the close of the market on August 3, 2022, the price of Ampio fell precipitously, as the prior artificial inflation came out of the price over time.  As a result of the defendants' material misstatements and omissions—plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

53.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Ampio common stock during the Class Period.  Excluded from the Class are defendants and their families, directors, and officers of Ampio and their families and affiliates.

54.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims as a class action will provide substantial benefits to the parties and the Court.  As of August 8, 2022, Ampio had tens of millions of shares and approximately 226 million shares of common stock outstanding, owned by hundreds or thousands of investors.

55.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether defendants violated the Exchange Act;

(b)     whether defendants omitted and/or misrepresented material facts;

(c)     whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e)     whether defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f)     whether defendants' conduct impacted the price of Ampio common stock;

(g)     whether defendants' conduct caused the members of the Class to sustain damages; and

(h)     the extent of damages sustained by Class members and the appropriate measure of damages.

56.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

57.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

58.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

**INAPPLICABILITY OF STATUTORY SAFE HARBOR**

59.     Ampio's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

60.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Ampio who knew that the statement was false.  None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when they were made, nor were any of the projections or forecasts made by defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

61.     At all relevant times, the market for Ampio common stock was an efficient market for the following reasons, among others:

(a)     Ampio common stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)     Ampio filed periodic public reports with the SEC and the New York Stock Exchange;

(c)     Ampio regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Ampio was followed by several securities analysts employed by numerous major brokerage firms, who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

62.     As a result of the foregoing, the market for Ampio common stock promptly digested current information regarding Ampio from all publicly available sources and reflected such information in the price of Ampio shares.  Under these circumstances, all purchasers of Ampio common stock during the Class Period suffered similar injury through their purchase of Ampio shares at artificially inflated prices and the presumption of reliance applies.

63.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on defendants' material omissions.  Because this action

involves defendants' failure to disclose the true, material, and negative financial impact facing the Company, as well as Ampio's true ability to bring Ampion to market based on the results of its clinical trials—information that defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the sustainability of Ampio's financial results and growth and the Company's inventory levels, and the impact that could have on the Company's near-term and long-term financial condition, that requirement is satisfied here.

<u>COUNT I</u>

**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**
**Against All Defendants**

64.     Plaintiff repeats and realleges each and every allegation contained above, as if fully set forth herein.

65.     During the Class Period, defendants carried out a plan, scheme, and course of conduct which intended to and, throughout the Class Period, did (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; and (ii) cause plaintiff and other members of the Class to purchase Ampio common stock at artificially inflated prices.

66.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Ampio shares in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5, promulgated thereunder.

67.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

68.     During the Class Period, defendants made the false statements specified above, which they knew to be or recklessly disregarded the truth that they were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

69.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Ampio's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

70.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Ampio shares of common stock.  Plaintiff and the Class would not have purchased the Company's shares at the prices they paid, or at all, had they been aware that the market prices for Ampio common stock had been artificially inflated by defendants' fraudulent course of conduct.

71.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's shares during the Class Period.

72.     By virtue of the foregoing, defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against the
### Individual Defendants

73.     Plaintiff repeats and realleges each and every allegation contained above, as if fully set forth herein.

74.     The Individual Defendants acted as controlling persons of Ampio within the meaning of section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).  By virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and intimate knowledge of the Company's actual performance, and their power to control public statements about Ampio, the Individual Defendants had the power and ability to control the actions of Ampio and its employees.  By reason of this conduct, the Individual Defendants are liable under section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

75.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

76.     Awarding compensatory damages in favor of plaintiff and other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

77.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

78.     Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  August 17, 2022

ROBBINS LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
GREGORY E. DEL GAIZO

_____
BRIAN J. ROBBINS

5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
        csmith@robbinsllp.com
        gdelgaizo@robbinsllp.com

Attorneys for Plaintiff

1586040

# CERTIFICATION OF PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAW</u>

Christopher Kain ("Plaintiff") declares as to the claims asserted, or to be asserted, under the federal securities laws, that:

1.      Plaintiff has reviewed the Class Action Complaint and has retained Robbins LLP as counsel in this action for all purposes, and authorized the filing of the Complaint.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| SECURITY | TRANSACTION (Purchase/Sale) | QUANTITY | TRADE DATE | PRICE PER SHARE/SECURITY |
|---|---|---|---|---|
| | See Attachment | | | |
| | | | | |
| | | | | |
| | | | | |

4.      Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

5.      Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws within the past three years, unless otherwise stated in the space below:

_____

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

7.      Plaintiff represents and warrants that he is fully authorized to enter into and execute this certification.

16      I declare under penalty of perjury that the foregoing is true and correct.  Executed this _____ day of August, 2022.

DocuSigned by:

3E1C420F9FAA47A...

CHRISTOPHER KAIN

| SECURITY | TRANSACTION (Purchase/Sale) | QUANTITY | TRADE DATE | PRICE PER SHARE/SECURITY |
|---|---|---|---|---|
| Common Stock | Sale | (13000) | 1/11/2021 | 1.4200 |
| Common Stock | Purchase | 775 | 2/8/2021 | 2.1350 |
| Common Stock | Purchase | 1500 | 2/8/2021 | 2.0950 |
| Common Stock | Sale | (1525) | 3/4/2021 | 1.5400 |
| Common Stock | Sale | (3226) | 3/4/2021 | 1.5500 |
| Common Stock | Sale | (6724) | 3/4/2021 | 1.5300 |
| Common Stock | Sale | (5000) | 3/16/2021 | 1.8000 |
| Common Stock | Sale | (1200) | 3/22/2021 | 1.8110 |
| Common Stock | Sale | (3800) | 3/22/2021 | 1.8150 |
| Option | Purchase | 100 | 7/1/2021 | 0.40 |
| Option | Purchase | 100 | 7/1/2021 | 0.40 |
| Option | Purchase | 17800 | 7/1/2021 | 0.40 |
| Option | Purchase | 1000 | 7/8/2021 | 0.30 |
| Option | Purchase | 300 | 7/15/2021 | 0.08 |
| Option | Purchase | 1600 | 7/15/2021 | 0.08 |
| Option | Purchase | 400 | 7/19/2021 | 0.10 |
| Option | Purchase | 8500 | 7/30/2021 | 0.35 |
| Option | Purchase | 1500 | 7/30/2021 | 0.35 |
| Option | Purchase | 1200 | 8/4/2021 | 0.35 |
| Option | Purchase | 3300 | 9/8/2021 | 0.30 |
| Option | Sale | (14500) | 11/15/2021 | 0.05 |
| Common Stock | Purchase | 2350 | 11/16/2021 | 1.2790 |
| Common Stock | Purchase | 500 | 4/6/2022 | 0.4412 |
| Common Stock | Purchase | 7500 | 4/6/2022 | 0.4413 |
| Common Stock | Purchase | 2250 | 4/7/2022 | 0.4348 |
| Common Stock | Purchase | 2500 | 4/7/2022 | 0.4354 |
| Common Stock | Purchase | 5000 | 4/7/2022 | 0.4511 |
| Common Stock | Purchase | 5920 | 4/18/2022 | 0.3680 |
| Common Stock | Sale | (71) | 4/20/2022 | 0.2099 |
| Common Stock | Sale | (100) | 4/20/2022 | 0.2012 |
| Common Stock | Sale | (100) | 4/20/2022 | 0.2050 |
| Common Stock | Sale | (1000) | 4/20/2022 | 0.2080 |
| Common Stock | Sale | (2000) | 4/20/2022 | 0.2075 |
| Common Stock | Sale | (2151) | 4/20/2022 | 0.2100 |
| Common Stock | Sale | (2300) | 4/20/2022 | 0.2017 |
| Common Stock | Sale | (3000) | 4/20/2022 | 0.2010 |
| Common Stock | Sale | (4298) | 4/20/2022 | 0.2000 |
| Common Stock | Sale | (5000) | 4/20/2022 | 0.2083 |
| Common Stock | Sale | (6000) | 4/20/2022 | 0.2081 |