**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-02105-WJM-MEH

TAO WANG and SYNWORLD TECHNOLOGIES CORPORATION, Individually and on
Behalf of All Others Similarly Situated,

   Plaintiff,
   v.

AMPIO PHARMACEUTICALS, INC.     JURY TRIAL DEMANDED
MICHAEL A. MARTINO,
MICHAEL MACALUSO,
HOLLI CHEREVKA,
DAN STOKELY
DAVID BAR-OR,
PHILIP H. COELHO, and
RICHARD B. GILES

   Defendants.

_____

**AMENDED CLASS ACTION COMPLAINT**

_____

## TABLE OF CONTENTS

I.     NATURE AND SUMMARY OF THE ACTION ............................................................... 1

II.    JURISDICTION AND VENUE ...................................................................................... 5

III.   THE PARTIES .............................................................................................................. 6

       A.    Lead Plaintiffs ................................................................................................... 6

       B.    Defendants ......................................................................................................... 6

       C.    Confidential Witnesses ..................................................................................... 8

IV.    BACKGROUND OF THE CLAIMS ............................................................................ 10

       A.    Background Of Ampio And Ampion .............................................................. 10

       B.    The Impact Of The COVID-19 Pandemic ...................................................... 13

       C.    Executive Misconduct Leading Up To The Class Period ............................... 15

V.     CLASS PERIOD STATEMENTS AND EVENTS ....................................................... 16

       A.    Defendants' Material Misrepresentations And Omissions In 2020 Through
             August 2021 ..................................................................................................... 16

       B.    Ampio Finally Announces The Top-Line Results Of The AP-013 Trial But
             Continues To Mislead The Market In September 2021 .................................... 27

       C.    Defendants' Additional Material Misrepresentations And Omissions In 2021 .... 29

       D.    Ampio Issues An Update To The AP-013 Trial Results And Continues To
             Mislead Investors In March 2022 ................................................................... 30

       E.    Defendants' Additional Material Misrepresentations And Omissions In 2022 .... 32

       F.    The Truth Begins To Emerge ......................................................................... 33

VI.    THE TRUTH ABOUT AMPION AND AP-013 IS FINALLY DISCLOSED TO
       THE MARKET .............................................................................................................. 35

VII.   ADDITIONAL SCIENTER ALLEGATIONS ............................................................. 38

       A.    *Respondeat Superior* And Agency Principles Apply ...................................... 38

       B.    Defendants Knew Or Were Reckless In Not Knowing That The AP-013
             Trial Had Been Unblinded And Did Not Demonstrate Efficacy ..................... 39

       C.    Defendants Knew Or Were Reckless In Not Knowing That Ampio
             Employees Facilitated The Unauthorized Use Of Ampion ............................. 41

D.    Defendants Knew Or Were Reckless In Not Knowing That Ampio's Disclosure Controls Were Not Effective ............................................................. 41

E.    Ampion Was Ampio's Core Operation.................................................................. 42

F.    Ampio's Financial Motive ..................................................................................... 43

G.    Defendants' Experience And Education ................................................................ 44

H.    Defendants' Certifications Pursuant To The Sarbanes-Oxley Act Of 2002 Demonstrate Scienter ............................................................................................. 47

VIII.    LOSS CAUSATION.......................................................................................................... 48

IX.    CONTROL PERSON LIABILITY..................................................................................... 50

X.    APPLICABILITY OF THE FRAUD ON THE MARKET DOCTRINE......................... 51

XI.    AFFILIATED UTE PROVISION ..................................................................................... 53

XII.    NO SAFE HARBOR .......................................................................................................... 53

XIII.    CLAIMS FOR RELIEF ..................................................................................................... 54

COUNT I ....................................................................................................................................... 54

COUNT II ...................................................................................................................................... 57

XIV.    CLASS ACTION ALLEGATIONS ................................................................................... 59

XV.    PRAYER FOR RELIEF ..................................................................................................... 61

XVI.    JURY TRIAL DEMAND ................................................................................................... 62

Lead Plaintiffs Tao Wang ("Wang") and SynWorld Technologies Corporation ("SynWorld") (together "Plaintiffs"),[1] individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ampio Pharmaceuticals, Inc. ("Ampio" or the "Company"), analysts' reports about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.  NATURE AND SUMMARY OF THE ACTION

1.  This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Ampio common stock between December 29, 2020 and August 2, 2022, both dates inclusive (the "Class Period"). Plaintiffs are seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against the Company and certain of its top officials.

---

[1]     Pursuant to Rule 10(a) of the Federal Rules of Civil Procedure, Plaintiffs have amended the case caption to reflect all Defendants named herein and Plaintiffs' appointment as Lead Plaintiffs to represent the putative class.

2.      This case centers on Defendants' efforts to mislead the market about Ampio's only commercial drug candidate, Ampion® ("Ampion").  This occurred after the drug's latest clinical trial failed and Ampio's failure to disclose Ampio employees' serious misconduct in prematurely viewing the trial results and distributing Ampion for a use that had not been approved by the FDA.

3.      Ampio is an early-stage pharmaceutical development company.  During the Class Period, Ampio was developing the drug, Ampion, its lead product candidate with "unique immunomodulatory action and anti-inflammatory effects," to treat individuals with inflammatory conditions, including, but not limited to, severe osteoarthritis of the knee ("OAK") and COVID-19.

4.      Ampio commenced its second pivotal phase 3 trial of Ampion in OAK, AP-013 (the "AP-013 Trial"), in June 2019 and ultimately enrolled 1,034 patients.  The FDA had explicitly told Ampio that it required this second phase 3 trial to support an application for approval of Ampion in OAK.  The primary endpoints for the trial were an improvement in pain and function of the knee.

5.      In March 2020, due to the COVID-19 pandemic, the independent Safety Committee for the AP-013 Trial conducted a per-protocol interim analysis of the trial data and determined that the best course of action would be to halt further enrollment of the trial.

6.      However, by the time enrollment was paused and throughout the Class Period, Ampio was plagued by employee misconduct and deceit to cover up the trial's failure.  First, in violation of the AP-013 Trial protocol, Ampio's Chief Executive Officer ("CEO"), Michael Macaluso ("Macaluso"), Ampio's Chief Operating Officer ("COO"), Holli Cherevka, and several senior employees at Ampio knew by March 2020 that Ampion did not demonstrate efficacy for either of its primary endpoints but failed to report this failure to the market.  Instead, Defendants made a series of false and misleading statements representing that the Company remained blinded to the AP-013 Trial results, that they believed the AP-013 Trial would be successful, and that other

drug manufacturing companies were interested in partnering with Ampio for the distribution of Ampion, all of which they knew was not true given the failure of the AP-013 Trial.

7.      Second, unbeknownst to investors, an Ampio executive officer, either Cherevka or Macaluso, as well as certain directors, including David Bar-Or ("Bar-Or"), Philip H. Coelho ("Coelho"), and Richard B. Giles ("Giles"), approved the unauthorized use of Ampion outside of the Company's clinical trials, without obtaining FDA approval, which is strictly prohibited by the FDA.

8.      In order to salvage the trial that it had been touting to the market, Defendants mined over the results and cherry-picked a subset of patients who did show efficacy while falsely attributing any issues with the overall AP-013 results to missing data caused by COVID protocols. Defendants would frame this subset of patients as a "modified intent-to-treat" population and represented that they would seek the FDA's approval to use this data to support approval of Ampion.

9.      These assurances prevented Ampio's stock from plummeting and allowed the Company to raise $21 million in net proceeds through a direct offering of its stock, which closed on December 16, 2021.

10.     After reviewing Ampio's request to discuss the results of the AP-013 Trial, on April 20, 2022, the FDA responded that, among other things, it did not agree with the Company's proposed change from the intent-to-treat population to the modified intent-to-treat population for the primary endpoint analysis, that this was a substantive and material change that is not in accordance with the Special Protocol Assessment agreement that governed the AP-013 trial, and that the Company should have sought the FDA's agreement on these changes prior to analyzing and unblinding the data.  Most importantly, the FDA told Ampio that it did not agree that AP-013 could

serve as a second pivotal trial to support an application for approval of Ampion.

11.    The market was shocked by this unexpected negative development and Ampio's stock dropped more than 26%.

12.    Then, a month later, on May 16, 2022, Ampio announced that it would be appointing an independent special committee of the board of directors, with the assistance of independent legal counsel, to conduct an internal investigation relating to the AP-013 Trial and the unauthorized use of Ampion by individuals not participating in clinical trials. That day Ampio also disclosed in its quarterly financial report that the Company's disclosure controls and procedures were not effective due to the issues being investigated by the special committee.

13.    The market again was rocked by this unexpected disclosure of corporate misconduct and ineffective controls, and Ampio's stock price dropped 10% over two trading days.

14.    On August 3, 2022, the Company made two bombshell announcements to the market. The Company first shocked the market by disclosing the results of the special committee's investigation, which had confirmed that certain Ampio executive officers and senior staff knew by March 2020 that the AP-013 trial did not demonstrate efficacy for Ampion on its co-primary endpoints of pain and function; and that these persons did not fully report the results of the AP-013 trial and the timing of unblinding of data from the AP-013 trial. The special committee also determined that certain Ampio personnel, including a former executive officer and certain former directors, facilitated the provision of Ampion for unauthorized use. As a result of their misconduct, the Company terminated the employment of Macaluso and Cherevka, as well as directors Bar-Or, Coelho, and Giles, and separated the roles of the CEO and Chairman of the Board of Directors.

15.    The Company also dropped another unexpected bombshell that same day by disclosing that it was completely abandoning the development of Ampion because in the clinical

trials run by Ampio, the drug has not demonstrated a benefit over the saline control. Indeed, the

Special Committee's analysis "has not identified either a sub-population of patients or combination

of inclusion/exclusion factors that predicts a trial design where there would be a reasonable

expectation for Ampion to outperform saline control."

16.     The market was jolted by this complete reversal on Ampion and the Company's

stock dropped an additional 37.5%.

17.     In October 2022, the SEC launched an investigation into Ampio's wrongdoing and

potential violations of the federal securities laws.

18.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline

in the market value of the Company's common stock when the true facts came to light, Plaintiffs

and other Class Members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

19.     This action arises under and pursuant to Sections 10(b) and 20(a) of the Exchange

Act (15 U.S.C. §§ 78j(b) & 78t(a)), and SEC Rule 10b-5 promulgated thereunder by the SEC (17

C.F.R. § 240.10b-5).

20.     This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331 and Section

27 of the Exchange Act (15 U.S.C. § 78aa).

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of

the Exchange Act (15 U.S.C. § 78aa) because Ampio's principal executive office is located in

Englewood, Colorado, which is situated in this District and the alleged false and misleading

statements entered and subsequently caused damages in this Judicial District. Pursuant to Ampio's

most recent quarterly report on Form 10-Q, as of August 7, 2023, there were 15,101,490 shares of

the Company's common stock outstanding. Accordingly, there are presumably hundreds, if not

thousands, of investors in Ampio's common stock located in the U.S., some of whom undoubtedly reside in this District.

22.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

III.    **THE PARTIES**

    A.    **Lead Plaintiffs**

23.     As shown in their PSLRA Certifications, Lead Plaintiffs Tao Wang, and his wholly-owned corporation, SynWorld Technologies Corporation, purchased Ampio common stock at artificially inflated prices during the Class Period and were injured thereby.

    B.    **Defendants**

24.     Defendant Ampio is a Delaware corporation with principal executive offices located at 9800 Mount Pyramid Court, Suite 400, Englewood, Colorado, 80112. The Company's common stock traded on an efficient market on the New York Stock Exchange ("NYSE") American under the ticker symbol "AMPE."

25.     Defendant Michael Martino has served as Ampio's Chief Executive Officer from November 2021 to the present and as a member the Company's Board of Directors (the "Board") from October 2021 to the present.

26.     Defendant Macaluso served as Ampio's Chief Executive Officer from January 2012 to November 2021 when he took a leave of absence to attend to a medical issue.  Macaluso served as the Chairman of Ampio's Board of Directors from May 2010 to May 2022.

27.     Defendant Cherevka was Ampio's President from October 2021 to May 2022; Chief Operating Officer from September 2017 to May 2022; Vice President of Operations from

May 2015 to September 2017; Senior Director of Clinical Trials from November 2013 to May

2015; and Director of Clinical Trials from January 2013 to November 2013.

28.     Defendant Dan Stokely has served as Ampio's Chief Financial Officer from July

2019 to the present.

29.     Defendant Bar-Or served as a director on Ampio's Board of Directors from

March 2010 to May 2022.

30.     Defendant Coelho served as a director on Ampio's Board of Directors from April

2010 to May 2022.

31.     Defendant Giles served as a director on Ampio's Board of Directors from August

2010 to May 2022.

32.     Defendants Martino, Macaluso, Cherevka, Stokely, Bar-Or, Coelho, and Giles are

collectively referred to hereinafter as the "**Individual Defendants**" and together with Ampio they

are referred to herein as the "**Defendants**."

33.     The Individual Defendants, because of their positions with the Company, possessed

the authority to control, correct, and/or update the contents of Ampio's public disclosures to the

market.  Each of the Individual Defendants had the duty to exercise due care and diligence and the

duty of full and candid disclosure of all material facts relating to the Company's financial results

and operations.  The Individual Defendants further had the duty to correct and/or update any

previously issued statements that were untrue or became materially misleading or untrue, so that the

market price of the Company's publicly traded common stock would be based upon truthful,

complete, and accurate information.  To discharge their duties, the Individual Defendants were

required to exercise reasonable and prudent supervision over the dissemination of information

concerning the Company's financial results and operations.  By virtue of such duties, these officers

and directors were required, *inter alia*, to:

    a)      conduct and supervise the business of Ampio in accordance with federal laws;

    b)      supervise the preparation of Ampio's SEC filings and approve any reports

            concerning Ampio's financial reporting and results; and

    c)      ensure that Ampio established and followed adequate internal controls.

    34.      As officers, directors, and/or controlling persons of a publicly-held company which

is registered with the SEC under the federal securities laws and the securities of which were traded

on the NYSE and governed by the provisions of the federal securities laws, the Individual

Defendants each had a duty to (1) promptly disseminate complete, accurate and truthful information

with respect to the Company's financial statements and operations; (2) correct any previously

issued statements that were materially misleading or untrue so that the market could accurately

price the Company's publicly traded securities based upon truthful, accurate, and complete

information; and (3) update any previously-issued statements that became materially misleading or

untrue so that the market could accurately price the Company's publicly traded securities based

upon truthful, accurate, and complete information.

    35.      The Individual Defendants are each primarily liable for the misrepresentations and

misleading statements alleged herein and are also liable as controlling persons of Ampio.  The

scheme deceived the investing public regarding Ampio's financial condition, which caused

Plaintiffs and other members of the Class to purchase Ampio common stock at artificially inflated

prices during the Class Period and suffer damages as a result.

    **C.**     **Confidential Witnesses**

    36.      Certain individuals provided information supporting the allegations that

Defendants knew or recklessly disregarded the falsity or misleading nature of the challenged

statements, and that Defendants engaged in a scheme to defraud investors. The confidential

witnesses ("CWs") are individuals formerly employed at the Company and/or relevant third

parties during the Class Period, whose accounts corroborate certain other sources set forth herein

and certain facts now admitted by Ampio. The CWs provided certain information to Plaintiffs'

counsel's investigators on a confidential basis and are described by job description and/or

responsibility, and duration of employment, thereby providing sufficient detail to establish their

reliability and personal knowledge. As discussed herein, the information provided by the CWs

supports a strong inference that the Defendants acted with scienter.

37.    CW1 was a technical writer at Ampio from April 2018 to July 2022. CW1's primary

responsibility was to draft the Standard Operating Procedures for the manufacturing team. CW1

also worked on preparing production records and various operations spreadsheets.

38.    CW2 was an operations technician from April 2018 to May 2021. CW2's primary

role for about the first year of his employment at Ampio involved running the manufacturing

process from the drug substance to the final product. CW2 later joined the clinical research team as

a clinical research associate. CW2 was trained on how to review the forms that were used for the

trial. From February 7, 2020 to March 2020, CW2 traveled to different clinical sites, including

three hospitals on the East Coast. CW2 reviewed the simple parts of the blinded patient packets,

which included pain surveys, but did not include the sections related to radiology and adverse

events.

39.    CW3 was the lead clinical research associate for the AP-013 Trial, which was

conducted by a third party called MedSource from October 2019 to April 2020.

IV.    BACKGROUND OF THE CLAIMS

A.    Background Of Ampio And Ampion

40.    As described in Ampio's SEC filings, the Company is a pre-revenue stage biopharmaceutical development company.  Ampio reported in SEC filings that it had developed a novel biologic drug, Ampion, to treat OAK, which the Company described as a growing epidemic in the U.S.

41.    Ampion contains a blood-derived peptide and small molecules that target multiple pathways in the immune response present in inflammatory disease.  *In vitro* studies have shown that Ampion represses the transcription of proteins responsible for inflammation, while activating anti-inflammatory proteins responsible for signaling tissue growth and healing. Ampion works by targeting the over production of inflammatory cytokines, which is common in several inflammatory diseases like osteoarthritis and respiratory disease.   Ampion has been shown to reduce inflammation along multiple pathways, which sets it apart from other anti-inflammatory therapies that target only one mechanism.

42.    Osteoarthritis ("OA") is the most common form of arthritis, and according to the Centers for Disease Control and Prevention (the "CDC"), OA affects over 32.5 million people in the United States.  It is a progressive and incurable disease of the joints involving degradation of the intra-articular cartilage, joint lining, ligaments, and bone.  Osteoarthritis is caused by inflammation of the soft tissue and bony structures of the joint, which worsens over time and leads to progressive thinning of intra-articular cartilage.

43.    Ampio has focused development of Ampion in severe osteoarthritis of the knee ("OAK"), which continues to be a growing epidemic in the United States and other countries worldwide.  Progression of the most severe form of OAK leaves patients with little or no

treatment options other than a total knee arthroplasty.  The FDA has asserted that severe OAK is an "unmet medical need" with no existing licensed therapy available.

44.     A new drug treatment goes through several phases of testing before it can be approved by the FDA.  Phase 1 trials only involve a small group of patients and focus on the safety and correct dosage of the drug.  Phase 2 trials usually involve fewer than 100 people and focus on the effectiveness and side effects of the drug.  Phase 3 trials usually involve hundreds or thousands of patients and focus on comparing the effectiveness of the drug to placebo or existing treatment.

45.     Since Ampio's inception, the Company has been running multiple clinical trials of Ampion in OAK in the United States, initially under the guidance of the FDA's Office of Blood Research and Review and most recently under the guidance of the FDA's Office of Tissues and Advanced Therapies.

46.     The first pivotal phase 3 trial for Ampion in OAK patients began in 2013 and was known as Study AP-003-A.  Study AP-003-A was a multicenter, randomized, double-blind trial of 329 patients who had severe OAK.  The patients were randomized 1:1 to receive an injection of Ampion into the knee or an injection of the saline control.  The study showed a statistically significant reduction in pain compared to the control, with an average of greater than 40% reduction in pain from baseline at 12 weeks with Ampion treatment.  Patients who received Ampion also showed a significant improvement in function and quality of life compared to patients who received the saline control at 12 weeks.

47.     In 2018, the FDA confirmed that trial AP-003-A could contribute to the evidence of effectiveness necessary for the approval of a Biologics License Application ("BLA")[2] for OAK patients.  However, the FDA told Ampio that it needed to complete an additional Phase 3 trial to support a BLA that would be carried out under a Special Protocol Assessment, or SPA.  An SPA is a process by which a drug development company communicates with the FDA to reach an agreement on the design and size of certain clinical trials to determine if they adequately address scientific and regulatory requirements to support approval of a BLA.  An SPA agreement indicates concurrence by the FDA with the adequacy and acceptability of specific critical elements of overall protocol design for a study intended to support a future BLA.

48.     Therefore, in June 2019, Ampio entered into an SPA with the FDA for its additional Phase 3 trial of severe OAK patients, the AP-013 trial titled "A Randomized, Controlled, Double-Blind Study to Evaluate the Efficacy and Safety of an Intra-Articular Injection of Ampion in Adults with Pain Due to Severe Osteoarthritis of the Knee."

49.     The SPA agreement for the AP-013 study finalized patient enrollment at 1,034 patients with severe OAK, with a sample size assessment at an interim analysis of 724 patients to allow an adjustment up to 1,551 patients if deemed necessary.  In the SPA agreement, the FDA agreed that the design and planned analysis of the AP-013 study adequately addressed the objectives necessary to support a regulatory submission.  Following the receipt of the SPA agreement, Ampio initiated the AP-013 study, identified and engaged clinical sites for the clinical trial, and initiated dosing of patients at those sites.

---

[2]     A BLA is a request for permission from the FDA to distribute a biologic product into the drug market.  A BLA generally applies to vaccines and other allergenic drug products, blood products, and cellular and genetic therapies.

50.     The goal of the trial was to evaluate the greater efficacy for pain improvement and function improvement of 4 mL Ampion versus a saline control via intra-articular injection into the knee after 12 weeks.

51.     The AP-013 study began on June 24, 2019.  As a double-blind study, the AP-013 Trial was designed so that neither the investigators nor the patients know which patients receive the active drug—here, Ampion—or the control—here, saline.  Blinding is intended to minimize the potential biases resulting from differences in management, treatment, or assessment of patients, or interpretation of results that could arise as a result of subject or investigator knowledge of the assigned treatment.

52.     Accordingly, the AP-013 Trial's study protocol provided that "[p]atients, the investigator, Sponsor [*i.e.*, Ampio], and all study staff having a role in the day-to-day conduct of the study will remain blinded to the treatment assignment."

53.     As part of the protocol, the AP-013 Trial had a Safety Monitoring Committee ("SMC") in place to periodically review the safety data to ensure that the drug was not harming patients.  SMCs are comprised of several clinicians and statisticians knowledgeable in the field who are independent from the drug company running the trial.  The role of an SMC is to review the data collected from the ongoing trial and conduct a risk benefit analysis to advise the sponsor drug company on whether it is safe to continue to the trial based on efficacy and safety concerns.  Ideally, the SMC is the only body that has access to unblinded data during the pendency of a clinical trial.

**B.     The Impact Of The COVID-19 Pandemic**

54.     In January 2020, the United States Department of Health and Human Services declared COVID-19 a public health emergency in the United States and the CDC indicated that older adults, age 65 years and older, are at higher risk for severe illness as a result of COVID-19.

The AP-013 study population was comprised of elderly patients with an average age of 65 years old and a maximum age of 87 years. Therefore, guidance from the CDC indicated the AP-013 study population was the highest risk demographic for developing severe illness during the current COVID-19 pandemic.

55.     In March 2020, and updated on January 27, 2021, the FDA acknowledged the impact of COVID-19 on clinical trials in published guidance, *FDA Guidance on Conduct of Clinical Trials of Medical Products during the COVID-19 Pandemic* (the "FDA COVID-19 Guidance"), which outlined the Agency's recommendations for ensuring clinical trial participant safety and adherence to good clinical practice guidelines and protocol requirements for clinical trials during the outbreak.

56.     Specifically, the FDA COVID-19 Guidance provided that, in regard to analyzing efficacy data, the "FDA recommends consultation with the appropriate review division regarding protocol modifications for the collection of efficacy endpoints, such as use of virtual assessments, delays in assessments, and alternative collection of research-specific specimens, if feasible." "If changes in the protocol will lead to amending data management and/or statistical analysis plans, the sponsor should consider doing so in consultation with the applicable FDA review division. Prior to locking the database, sponsors should address in the statistical analysis plan how protocol deviations related to COVID-19 will be handled for the prespecified analyses."

57.     In a press release issued on March 24, 2020, Ampio acknowledged the impact of COVID on its Ampion clinical trial but stated that the SMC recommended that "the study cease enrolling patients because the number of injected patients, 1,019, is sufficiently close to the number of patients called for by the sample size re-estimation algorithm, 1,034."

58.     Elevated levels of inflammatory cytokines are correlated with COVID-19 severity

and may also trigger additional complications including pneumonia, acute lung injury, and/or

acute respiratory distress syndrome, which is a leading cause of mortality in COVID-19.  *Id.*

Ampio believed that by targeting and reducing the production of inflammatory cytokines,

Ampion could improve the clinical outcome for patients with COVID-19.  *Id.*

59.     Thus, Ampio also began developing Ampion separately as a treatment for

COVID-19 induced inflammation.

### C.     Executive Misconduct Leading Up To The Class Period

60.     In March 2020, the SMC conducted a per-protocol interim analysis for the OAK AP-

013 Trial to ensure that it was safe for the patients enrolled.

61.     As disclosed after the Class Period, certain former senior executive officers,

including Cherevka and Macaluso, and senior staff became aware at the time of the interim analysis

that the AP-013 Trial for Ampion did not demonstrate efficacy for pain and function, the two

primary endpoints for the drug, even though as a blinded trial they were not supposed to know of

the results at this time.

62.     During this time and throughout the Class Period, an Ampio executive officer, either

Cherevka or Macaluso, as well as certain directors, including David Bar-Or, Philip H. Coelho, and

Richard B. Giles, facilitated the unauthorized use of Ampion.  Given the global pandemic occurring

during this time and the lack of any available treatment, the employees were presumably

distributing Ampion for use to combat COVID-19 outside the context of Ampio's clinical trials.

63.     The FDA has very strict regulations prohibiting the distribution of drugs that have

not been approved by the agency outside the context of a clinical trial.  21 U.S.C. § 355(a) provides

that "No person shall introduce or deliver for introduction into interstate commerce any new drug,

unless an approval of an application filed pursuant to subsection (b) or (j) is effective with respect

to such drug." The FDA has explained that "unapproved prescription drugs pose significant risks to patients because they have not been reviewed by FDA for safety, effectiveness or quality."

## V.    CLASS PERIOD STATEMENTS AND EVENTS[3]

64.    In light of the fact that several executive officers and senior management had viewed the data from AP-013 in March 2020 and had determined that the trial did not show efficacy in either pain or function, and that one executive officer and certain directors were facilitating the unauthorized use of Ampion outside of the Company's clinical trials, in violation of federal regulations, Defendants made four categories of misleading statements during the Class Period: (1) misleading statements regarding the unblinding and success of the AP-013 Trial; (2) misleading statements regarding the potential for partnership with a drug manufacturing company; (3) misleading statements regarding the ethical and legal conduct of Ampio's employees; and (4) misleading statements regarding the efficacy of Ampio's disclosure controls.

### A.    Defendants' Material Misrepresentations And Omissions In 2020 Through August 2021

65.    The Class Period begins on December 29, 2020 when Ampio issued a press release discussing the FDA's feedback on Ampio's proposed modifications to the AP-013 trial's Special Protocol Assessment, or SPA, in light of COVID-19. Ampio stated, in part, "In addition, the FDA provided practical guidance for the AP-013 study to navigate the pandemic, and to complete the study without re-running the trial. ***The FDA options give us the opportunity to provide additional evidence to support the use of existing data and/or add more patients to the trial***."

66.    The statements in ¶ 65 above were false and/or misleading when made because Ampio failed to disclose that in March 2020 several Ampio employees viewed the AP-013 Trial

---

[3]    The bolded and italicized statements herein are the statements alleged to be false and/or misleading. They are presented in context.

data and knew that Ampion did not demonstrate efficacy for either of its two primary endpoints and

therefore the Company could not provide additional evidence to support the use of existing data

and/or add more patients to the trial.

67.    On February 24, 2021, Ampio revised its Code of Business Conduct and Ethics

("Code of Ethics") and posted the document on its website.  The Code of Ethics remained on

Ampio's website for the duration of the Class Period.  The document states, in part:

> Obeying the law is the foundation on which Ampio's ethical standards are built.
> *You must comply with applicable laws, rules and regulations*.
>
> \* \* \*
>
> *Ampio's policy is to promote high standards of integrity by conducting its
> affairs honestly and ethically*.  *Each director, officer and employee must act
> with integrity and observe the highest ethical standards of business conduct* in
> his or her dealings with the Company's customers, suppliers, partners, service
> providers, competitors, employees and anyone else with whom he or she has
> contact in the course of performing his or her job.
>
> \* \* \*
>
> *Ampio expects all directors, officers and employees who are involved in the
> preparation of SEC reports or other public documents to ensure that the
> information disclosed in those documents is complete, fair, accurate*, timely and
> understandable.
>
> \* \* \*
>
> *Ampio follows all applicable laws and regulations governing the manufacturing
> and distribution of drugs, devices and biological products.  In particular, we
> observe all legal requirements applicable to the Company including, but not
> limited to those of the U.S. Food and Drug Administration and the U.S.
> Department of Health and Human Services Office of Inspector General, and we
> expect every employee to do likewise at all times*.
>
> \* \* \*
>
> Therefore, all employees are obligated to understand the basic rules with respect
> to labeling, promotion, off-label use, pharmaceutical samples and adverse event
> reporting.  *As a pharmaceutical company, Ampio is also subject to many
> healthcare rules and regulations designed to protect the public.  As an Ampio*

**employee, you must comply with the laws and regulations relating to the conduct of business in the pharmaceutical industry that address**: • fraud and abuse in federal healthcare programs (Medicare and Medicaid); • improper influence of financial incentives on medical judgment; • the PhRMA Code; and • **the protection of patients and improvement of the quality of health care services**.

68.    The statements in ¶ 67 above were false and/or misleading when made because Ampio failed to disclose that Ampio senior employees had violated the Code of Ethics because (a) two executive officers and several senior employees had viewed the results of the AP-013 Trial in March 2020 in violation of the trial protocol and failed to disclose that Ampion did not demonstrate efficacy for either of its two primary endpoints to the market; and (b) one executive officer and several directors were facilitating the unauthorized use of Ampion in violation of federal regulations.

69.    On March 3, 2021, Ampio filed its annual report for the year ended December 31, 2020 with the SEC on a Form 10-K (the "2020 10-K").  The 2020 10-K was signed by Macaluso, Stokely, Bar-Or, Coelho, Giles, and Stevens.  The Business Overview section of the 2020 10-K stated, in relevant part:

**In April 2020, we paused ongoing conduct of the AP-013 study**, and we continue to monitor the COVID-19 health situation and updated FDA guidance on conducting clinical trials in a pandemic.  COVID-19 cases across the United States continue to be reported, therefore, **we have determined that the AP-013 study will remain paused as we continue to explore options to enable us to complete the study**.  Currently, the Company is evaluating options for the AP-013 study using scientific publications and the FDA guidance including, *"Statistical Considerations for Clinical Trials During the COVID-19 Public Health Emergency"*, which is specifically designed to assist the pharmaceutical industry with viable options for evaluating data from clinical trials which were adversely impacted by the pandemic.  In order to remain in compliance with such guidance, we are working with the FDA on a proposal for the AP-013 study.  However, it is possible that the COVID-19 pandemic may prevent completion of the AP-013 study at this time or at all.

18

70.     The statements in ¶ 69 above were false and/or misleading when made because Defendants failed to disclose that the interim analysis of the AP-013 Trial results conducted in March 2020 showed that the drug did not demonstrate efficacy for either of the Trial's primary endpoints.

71.     The Risk Factors Section of the 2020 10-K stated, in relevant part:

***In connection with clinical testing and trials, we face a number of risks, including, but not limited to the following: . . . Ampion is ineffective***, or is considered inferior to existing approved medicines; . . . ***the results may not confirm the positive results of earlier testing or trials***; . . . ***the results may not meet the level of statistical significance required by the FDA or other regulatory agencies to establish the safety and efficacy of Ampion . . .***

***Any unfavorable outcome of our AP-013 study of Ampion, which we anticipate will be the last clinical trial that we conduct prior to BLA submission, would be a major set-back for the development program and for us***. Due to our limited financial resources, an unfavorable outcome in the AP-013 study may require us to delay, reduce the scope of, or eliminate our OAK product development program, which we expect would have a material adverse effect on our business and financial condition and on the value of our common stock.

\* \* \*

***Our employees, principal investigators, consultants and commercial partners may engage in misconduct or other improper activities.*** . . . We are exposed to the risk that our employees, contract research organizations, principal investigators, consultants, and commercial partners may engage in fraudulent conduct or other illegal activity or may fail to disclosure [sic] unauthorized activities to us. ***Misconduct by these parties could include intentional, reckless and/or negligent failures to comply with: . . . the laws and regulations of the FDA and non-U.S. regulators, including those laws requiring the reporting of true, complete and accurate information to such regulatory bodies; . . . laws requiring the accurate reporting of financial information or data or the disclosure of unauthorized activities to us. . . . We have adopted a Code of Business Conduct and Ethics applicable to all of our employees***, but it is not always possible to identify and deter employee misconduct, and the precautions we take to detect and prevent this activity may not be effective in controlling unknown or unmanaged risks or losses or in protecting us from governmental investigations or other actions or lawsuits stemming from a failure to comply with these laws or regulations*.

72.     The statements in ¶ 71 above were false and/or misleading when made because

Defendants failed to disclose that:

    a)     the interim analysis of the AP-013 Trial results conducted in March 2020

          showed that the drug did not demonstrate efficacy for either of the Trial's

          primary endpoints;

    b)     two executive officers and several senior employees had viewed the results

          of the AP-013 Trial in March 2020 in violation of the trial protocol and failed

          to disclose the negative results to the market; and

    c)     one executive officer and several directors were facilitating the unauthorized

          use of Ampion in violation of federal regulations.

73.     The Evaluation of Disclosure Controls and Procedures Section stated, in part:

As of the end of the period covered by this report, ***we carried out an evaluation***,
under the supervision and with the participation of senior management, including
the CEO and the CFO, ***of the effectiveness of the design and operation of our
disclosure controls and procedures pursuant to Exchange Act Rules 13a-15(b)
and 15d-15(b). Based upon this evaluation, the CEO and the CFO concluded
that our disclosure controls and procedures as of the end of the period covered
by this report were effective***.

74.     Substantially similar statements to ¶ 73 were made in:

    a)     Ampio's quarterly report for the first quarter of 2021 filed on May 5, 2021 with

          the SEC on Form 10-Q (the "1Q 2021 10-Q"), which was signed by Macaluso

          and Stokely;

    b)     Ampio's quarterly report for the second quarter of 2021 filed on August 4, 2021

          with the SEC on Form 10-Q ("2Q 2021 10-Q"), which was signed by Macaluso

          and Stokely;

c)  Ampio's quarterly report for the third quarter of 2021 filed on November 10,
2021 with the SEC on Form 10-Q (the "3Q 2021 10-Q"), which was signed by
Macaluso and Stokely;

d)  Ampio's annual report for the year ended December 31, 2021 filed on March 29,
2022 with the SEC on Form 10-K ("2021 10-K"), which was signed by Martino,
Stokely, Macaluso, Bar-Or, Coelho, Giles, and others.

75.  The statements in ¶¶ 73-74 above were false and/or misleading when made because
Defendants failed to disclose that Ampio's disclosure controls and procedures were not effective
because (a) two executive officers and several senior employees had viewed the results of the AP-
013 Trial in March 2020 in violation of the trial protocol and failed to disclose the negative results
to the market; and (b) one executive officer and several directors were facilitating the unauthorized
use of Ampion in violation of federal regulations which was concealed from the market.

76.  Macaluso and Stokely signed certifications pursuant to Section 302 the Sarbanes-
Oxley Act of 2002 that accompanied the 2020 10-K.  The certifications stated, in relevant part:

> **Based on my knowledge, this report does not contain any untrue statement of a
> material fact or omit to state a material fact necessary to make the statements
> made, in light of the circumstances under which such statements were made,
> not misleading with respect to the period covered by this report**.

77.  The statements in ¶ 76 above were false and/or misleading when made because
Defendants failed to disclose that (a) two executive officers and several senior employees had
viewed the results of the AP-013 Trial in violation of the trial protocol and failed to disclose the
negative results to the market; and (b) one executive officer and several directors were facilitating
the unauthorized use of Ampion in violation of federal regulations which was concealed from the
market.

21

78.     Later that day, on March 3, 2021, Ampio held an earnings conference call to discuss

the financial results from the year ended December 31, 2020.  That month, Ampio submitted a

proposal to the FDA in response to the FDA's guidance on the status of the AP-013 trial.  During

the conference call, Ampio management commented on the trial, stating, in relevant part:

> [Macaluso]:  Please note ***we will not unblind the data completely until we have
> written confirmation.  Let me say that again, we will not unblind the data at all
> until we have written confirmation from the FDA that our proposal has been
> accepted and our existing SPA remains in effect***. To repeat, we have submitted
> our proposal to the FDA to use existing data only, and if it is statistically
> significant, to proceed forward and file our BLA.  We will update you when we
> have a response in writing from the FDA, and we would expect that response in
> the next 45 days or less.
>
> \*   \*   \*
>
> [Cherevka]: So we -- as Mike mentioned, ***we plan to remain blinded until we
> reach agreement with the FDA, with the agency***. And so we anticipate staying
> close in step with the agency to continue the dialogue. And in our most recent
> proposal, we've delineated both those populations who we believe to be
> unaffected versus affected from the COVID-19 pandemic. And we presented that
> to the agency and eagerly await their feedback. . . .
>
> [Macaluso]: ***I'm honestly looking forward to unblinding it. I think it's going to
> be good***.
>
> \*   \*   \*
>
> [Macaluso]: ***So that's very important to us.  If it was just a matter of unblinding,
> we would have done it. But in this case, we want to make sure the SPA stays in
> place so that if that data is good, it's our final trial***.
>
> \*   \*   \*
>
> [Macaluso]: . . . Again, to sort of reaffirm what we've said, the proposal to the
> FDA on OAK is gone.  They're reviewing it or doing what they do. . . .  ***And it's
> done and in their hands. And I'm looking forward to the response. And
> honestly, I'm looking forward to unblinding the data***.

79.     The statements in ¶ 78 above were false and/or misleading when made because

Ampio, Macaluso, and Cherevka failed to disclose that they had already viewed the unblinded data

from the AP-013 Trial in March 2020 and that data showed that the drug did not demonstrate

efficacy for either of the Trial's primary endpoints.

80.    On May 5, 2021, Ampio filed its quarterly report for the first quarter of 2021 with

the SEC on Form 10-Q (the "1Q 2021 10-Q"). The 1Q 2021 10-Q was signed by Macaluso and

Stokely. The Financial Information Section of the 1Q 2021 10-Q, stated, in relevant part:

> *Until agreement with the FDA is reached, the AP-013 study data will continue*
> *to remain paused and blinded to ensure clinical trial integrity*.

81.    The Management's Discussion and Analysis of Financial Condition and Results of

Operations Section stated, in relevant part:

> *In April 2020, we paused ongoing conduct of the AP-013 study*. In March 2021,
> the Company submitted a detailed proposal to the FDA in response to the FDA's
> guidance regarding the status of the AP-013 study. In April 2021, we received a
> response to our proposal from the FDA, which we are currently evaluating, and
> we will continue to maintain an ongoing active dialog with the FDA until a
> decision is finalized. *During this period, the AP-013 study will continue to*
> *remain paused and blinded to ensure clinical trial integrity and compliance*
> *with the SPA*.

82.    The statements in ¶¶ 80-81 above were false and/or misleading when made because

Ampio, Macaluso, and Stokely failed to disclose that Ampio employees had already viewed the

unblinded data from the AP-013 Trial in March 2020 and that data showed that the drug did not

demonstrate efficacy for either of the Trial's primary endpoints.

83.    Later that day, Ampio held a conference call to discuss the financial results from the

first quarter of 2021. During the conference call, Ampio management stated, in relevant part:

> [Macaluso]: . . . Back to OAK for a minute. The recent FDA guidance provided
> us with options that would keep the SPA in place. That's important. But which
> option do we choose? I want our [pharmaceutical company] partner – not a
> potential partner, our partner to make that decision. . . .
>
> By the way, *if pharma wants us to unblind the trial first and then they deal with*
> *the FDA, we are set up to do that quickly*. We have started the process of

cleaning the data. *And even though we remain blinded, we're anxious to get it unblinded*.

\* \* \*

[Cherevka]: . . . At present, we are currently engaged in a special protocol assessment with the agency, and *we continue to remain blinded and that continues to be a priority for the company*.  However, the FDA provided several options and opportunities related to the overall management of the protocol, statistical analysis and enrollment. . . .

\* \* \*

[Macaluso]*: . . . So if we were to unblind now and if the pharmaceutical company, for example, that would be our partner wanted to have a different label or a different pricing assumptions that would have to be done before we unblind so that we make sure that whatever we've done would meet that criteria*.

Again, I don't know what those assumptions would be. Our potential partners would know who that is or what that is. So we're going to – we're in those discussions. But like I said in my talk, *I would be happy.  I'd love to unblind that data and use that as evidence. But once I do that, the chance to adjust it, change it or add more patients if they wanted for an additional label would disappear*. So we're going to – we're cleaning the data so that we can make a quick decision or have access to it quickly.  We're doing that. We started on it about a month ago. So whatever needs to happen, we're ready to have happen.

\* \* \*

[Analyst]: . . . So how long will it take for the data to be cleaned and approximately how long will it take, do you figure, until big pharma or any other pharmaceutical company is actually ready to sit down and finalize this?

[Macaluso]: Cleaning the data will take about a month, more or maybe 2. And when will the pharma [ counted ] finalize this?  I don't know.  I can't answer that. I don't have a crystal ball. *I know there's interest. I know we're working on it. I know we needed to complete some things before we could fully engage those discussions. We can do that now. We have people helping us set up those meetings. And the sooner the better is my answer*, . . . .

84.    The statements in ¶ 83 above were false and/or misleading when made because

Ampio, Macaluso, and Cherevka failed to disclose that (a) Ampio employees had already viewed

unblinded data from the AP-013 Trial in March 2020 and that data showed that the drug did not

24

demonstrate efficacy for either of the Trial's primary endpoints; and (b) no other pharmaceutical

company would be interested in partnering with Ampio for the development of Ampion because the

interim analysis conducted in March 2020 showed that the AP-013 Trial did not demonstrate

efficacy for either of the Trial's primary endpoints.

85.    On August 4, 2021, Ampio filed its quarterly report for the second quarter of 2021

with the SEC on Form 10-Q ("2Q 2021 10-Q").  The 2Q 2021 10-Q was signed by Macaluso and

Stokely.  The Management's Discussion and Analysis of Financial Condition and Results of

Operations Section of the 2Q 2021 10-Q stated, in relevant part:

> In April 2020, due to the impact of COVID-19, we paused the ongoing conduct of
> the AP-013 study. During fiscal 2020 and fiscal 2021, the FDA provided guidance
> specifically designed to assist the pharmaceutical industry with viable options for
> evaluating data from clinical trials which were impacted by the pandemic. In
> March 2021, we submitted a detailed proposal to the FDA in response to the
> FDA's recent guidance regarding the status of the AP-013 study. In May 2021,
> the FDA issued updated statistical guidance for the industry. ***At this time, we are
> evaluating our options to analyze the clinical trial data from the AP-013 study***.
>
>           \*   \*   \*
>
> In May 2021, the FDA issued updated statistical guidance for the industry. ***At this
> time, we are evaluating our options to analyze the clinical trial data from the
> AP-013 study.  During this period, the AP-013 study will remain paused and
> blinded to ensure clinical trial integrity and compliance with the SPA***.

86.    The statements in ¶ 85 above were false and/or misleading when made because

Ampio, Macaluso, and Stokely failed to disclose that Ampio employees had already analyzed the

unblinded data from the AP-013 Trial in March 2020 and that data showed that the drug did not

demonstrate efficacy for either of the Trial's primary endpoints.

87.    Later that day, Ampio held an earnings conference call to discuss the financial

results from the second quarter of 2021.  During the call, Ampio management made the following

statements, in relevant part:

[Macaluso]: . . . Consistent with our ongoing public communications, the OAK trial was paused in April 2020 because of COVID-19.  Since then, we have worked diligently with the FDA to gain better understanding of our viable options to preserve.  The study results to date, which include keeping the special protocol assessment or [SPA] in place.  One, by adding more patients after the pandemic is over; or 2, implementing the sensitivity analysis, which is basically a mathematical formula to minimize the impact of COVID-19.

I have gone back and forth on which option to select and the circumstances and timing associated with that decision. ***We have decided to proceed forward and unblind the study, utilizing the sensitivity analysis to eliminate any bias from the pandemic***. . . .

\* \* \*

[Stokely]: And Mike, this one is -- what do you need to do to be comfortable viewing the unblinded Phase III OAK data? Should a potential partner not materialize?

[Macaluso]: ***Well, we're unblinding***, Dan, so -- or Jonathan, who asked the question, Jonathan, ***we're unblinding the data. So we believe that good data will expand and escalate the interest. So we're unblinding the data ASAP. It's no longer something we're weighing. It's happening, and we're going to do it as soon as possible***. . . .

[Analyst]: Could you walk me through, like as you to hear your voice -- could you please walk me through sort of the unblind or continue to trial, the cost benefit that you went through? I know we talked about it the other day, but so your thoughts on -- you can't find decision to unwind and move forward.  Can you just walk through the -- how you came to that? And that is the question.

[Macaluso]: . . . So now we have a similar-sized trial that's sitting there blinded that it's sort of like the elephant in the room when we're having our discussions. And rather than talk hypothetically to people because ***I believe the data is going to be good based on that optimism.***

***But historically, every trial we've ever done using those patients has been effective and safe. . . . But hopefully, with good data, this will be enough to put us over the threshold and move us forward***. . . .

\* \* \* \*

[Analyst]: Just trying to get an idea if I – you came to a decision to unblind and go forward with that call.  And then just, could you talk a little bit about hoping to have good data, obviously, hoping that as well.  Can you walk through what's good versus bad data?  When you expect to see the equivalent data and what's the

clinically meaningful improvement you anticipate to see or hope to see unblinding the data?

[Macaluso]: Yes. ***Well, I hope to see statistical significance. But also, I would be happy with a very, very strong trend*** . . . . So it really is just about being better than the placebo, having a safe drug. . . . ***Our goal, obviously, is the statistical threshold, and I'd be very happy with that***, but also happy with a strong trend and it's positive and that the trial is about 1/3 the size of what it was planned to be.

\* \* \*

[Macaluso]: ***We have quality discussions going on with pharma***. What does that mean? It means that the first thing pharma looks at when they come into our data room is the data, right? ***That's what they look at, is our data good? Is it good enough? Is it – what they're looking for***? I can tell you, if they don't like the data, that's 1 day in and out of the data room and they're gone. That's never happened. . . . ***But we're having quality ongoing discussions with pharma, and that's important***.

88.      The statements in ¶ 87 above were false and/or misleading when made because

Ampio and Macaluso failed to disclose that (a) Ampio employees had already viewed unblinded

data from the AP-013 Trial in March 2020 and that data showed that the drug did not demonstrate

efficacy for either of the Trial's primary endpoints; and (b) no other pharmaceutical company

would be interested in partnering with Ampio for the development of Ampion because the interim

analysis conducted in March 2020 showed that the AP-013 Trial did not demonstrate efficacy for

either of the Trial's primary endpoints.

   **B.     Ampio Finally Announces The Top-Line Results Of The AP-013 Trial But
           Continues To Mislead The Market In September 2021**

89.      On September 15, 2021, Ampio announced in a press release the top-line results

of the AP-013 Trial.  The Company claimed that, as a result of the COVID-19 pandemic, the

FDA recommended that Ampio conduct a sensitivity analysis for the trial to detect any potential

biases related to the pandemic.  Without disclosing that the trial had been prematurely unblinded

in March 2020, at which time it was clear that it failed to meet its co-primary endpoints, the

Company stated that "*the data demonstrates a statistically significant impact from the pandemic*[,]" but attempted to salvage the trial by boasting in the press release that in "*a separate statistical analysis of the 725 patients that the Company believed not to have been impacted by the pandemic[,]" there was a statistically significant reduction in pain (p=0.0260) and improvement in function (p=0.0073), versus a critical p-value of 0.05, at 12 weeks with Ampion treatment compared to saline control. We plan to thoroughly analyze and consolidate all this study data with data from severe OAK patients in previous single-injection clinical studies performed by the Company and present it to the FDA in support of a BLA*."

90.      The statements in ¶ 89 above were false and/or misleading when made because Ampio failed to disclose that Ampio employees had already viewed unblinded data from the AP-013 Trial in March 2020 and that data showed that the drug did not demonstrate efficacy for either of the Trial's primary endpoints.  The interim data that had been improperly viewed by Ampio employees in March 2020 would have included the more complete data set unaffected by any purported impact from COVID, as the COVID-19 pandemic was just beginning at that time.  As Defendants would later note, prior to the COVID-19 pandemic, only 7% of patients had missing data, whereas during the COVID-19 pandemic, 70% of patients had missing data.  Ultimately, the Special Committee admitted on August 3, 2022 that an extensive meta-analysis of a merged database containing all clinical, laboratory and outcome data from all Ampion trials had not identified either a sub-population of patients or a combination of inclusion/exclusion factors that predicts a trial design where there would be a reasonable expectation for Ampio to outperform saline control, as shown in the below graphs from the Company's press release disclosing the Special Committee's finding.

28



### C. Defendants' Additional Material Misrepresentations And Omissions In 2021

91.     With these results in hand, and having satisfied the market with the false and/or misleading press release of September 15, 2021, Defendants continued to make misleading statements regarding the AP-013 Trial and the potential for partnership with a drug manufacturing company, the ethical and legal conduct of Ampio's employees, and the efficacy of Ampio's disclosure controls.

92.     On November 10, 2021, Ampio filed its quarterly report for the third quarter of 2021 with the SEC on Form 10-Q (the "3Q 2021 10-Q"). The 3Q 2021 10-Q was signed by Macaluso and Stokely. The Management's Discussion and Analysis of Financial Condition and Results of Operations Section stated, in relevant part with respect to the AP-013 trial:

> ***These results are consistent with the results from severe OAK patients in prior OAK trials that we have conducted*** and significantly expand the set of severe OAK patients treated with Ampion.

93.     On December 14, 2021, Ampio filed a prospectus supplement offering 25 million shares of common stock and warrants to purchase up to 15 million shares of common stock with a

combined purchase price of $0.90 per share.  The warrants would have an exercise price of $1.10

per share.  The prospectus supplement was filed with the SEC on Form 424(b)(5) and stated, in

relevant part with respect to the AP-013 trial:

> ***These results are consistent with the results from severe OAK patients in prior OAK trials that we have conducted and significantly expand the set of severe OAK patients treated with Ampion.***

94.    The statements in ¶¶ 92-93 above were false and/or misleading when made because

Ampio failed to disclose that Ampio employees did not believe that the AP-013 Trial results were

consistent with prior results because the Trial did not demonstrate efficacy for either of its primary

endpoints.

95.    The Risk Factors Section of the prospectus supplement stated, in relevant part:

> The following factors, in addition to the other risk factors described in this section, may also have a significant impact on the market price of our common stock: . . . ***any finding that Ampion is not safe or effective, or any inability to demonstrate the clinical effectiveness of Ampion when compared to existing treatments.***

96.    The statements in ¶ 95 above were false and/or misleading when made because

Ampio failed to disclose that employees had already determined in March 2020 that Ampion failed

to demonstrate clinical effectiveness because the AP-013 Trial did not demonstrate efficacy for

either of its primary endpoints.

**D.    Ampio Issues An Update To The AP-013 Trial Results And Continues To Mislead Investors In March 2022**

97.    On March 2, 2022, Ampio issued an update to the AP-013 Trial results in a press

release.  After conducting a post hoc analysis, Ampio claimed that it found a modified intent-to-

treat ("mITT") population of 618 patients that it believed were not affected by the COVID-19

pandemic.[4]  The press release stated, in relevant part:

> "As a result of the large amounts of missing data [due to the pandemic], our analyses of the AP-013 data started with applying FDA's recommendation to conduct a sensitivity analysis to determine if there was an impact of COVID-19 on the study, *which we outlined and documented in a study plan prior to unblinding the data*," said Holli Cherevka, Ampio's President and Chief Operating Officer.  "This sensitivity analysis found a statistically significant impact from COVID-19, and as specified in our study plan, *we have proposed a mITT population to assess efficacy.  In this mITT population (n=618), which retained more than 85% power to evaluate improvements in pain, Ampion demonstrated a statistically significant reduction in pain (p=0.042) and trended favorably toward improvement in function versus saline control.  Further, the results in the Per Protocol efficacy population (n=580), including in the original AP-013 statistical analysis plan, support these observations with a statistically significant reduction in pain (p = 0.020) and a statically significant improvement in function versus saline control*."

> Mike Martino, Ampio's Chief Executive Officer and Chairman added, "*We believe that the AP-013 data confirms the results from AP-003-A and supports the safety and efficacy of Ampion for the treatment of severe OAK*."

98.    The statements in ¶ 97 above were false and/or misleading when made because

Ampio failed to disclose that employees had already determined in March 2020 that Ampion failed

to demonstrate clinical effectiveness because the AP-013 Trial did not demonstrate efficacy for

either of its primary endpoints.

99.    The press release went on to explain that following obtaining the modified results

from the AP-013 Trial, Ampio submitted a Type C meeting request to the FDA to discuss

potentially submitting a BLA.  The central question in that request was whether the FDA would

---

[4]    The intent-to-treat population is defined as the full analysis set, including all randomized subjects in the trial, regardless of their compliance with the protocol.  *See Guidance for Industry: E9 Statistical Principles for Clinical Trials*, Food and Drug Administration, 28 (Sept. 1998) ("FDA Statistical Guidance").

accept the AP-013 trial as a confirmatory trial for the previous Phase 3 trial, AP-003, and support submission of a BLA.

100.    Despite the FDA's clear guidance that, "[p]rior to locking the database" and unblinding the data, a sponsor drug company should consider consulting with the FDA regarding amending any statistical analysis plans set forth in a trial protocol (*see* FDA COVID-19 Guidance at 5), Ampio never discussed with the FDA its plan to analyze the efficacy data from different subsets of the patient population.

### E.    Defendants' Additional Material Misrepresentations And Omissions in 2022

101.    On March 29, 2022, Ampio filed its annual report for the year ended December 31, 2021 with the SEC on Form 10-K ("2021 10-K").  The 2021 10-K was signed by Martino, Stokely, Macaluso, Bar-Or, Coelho, Giles, and others.  The Risk Factors Section of the 2021 10-K stated, in relevant part:

> ***Our current or former personnel, board members, independent contractors, consultants, commercial collaborators, principal investigators, CROs, suppliers and vendors may engage in misconduct or other improper activities, including noncompliance with regulatory standards and requirements, that results in a material negative impact to the Company. . . .***
>
> ***We are exposed to the risk that our current or former personnel, independent contractors, consultants, commercial collaborators, principal investigators, CROs, suppliers and vendors may engage in misconduct or other improper activities that results in a material negative impact to the Company***.

102.    The statements in ¶ 101 above were false and/or misleading when made because Defendants failed to disclose that Ampio employees had already engaged in misconduct because (a) two executive officers and several senior employees had viewed the results of the AP-013 Trial in violation of the trial protocol and failed to disclose the negative results to the market; and (b) one executive officer and several directors were facilitating the unauthorized use of Ampion in violation of federal regulations.

103.    Later that day Ampio held a conference call to discuss the financial results for the

year ended December 31, 2021.  During the conference call, Ampio and Martino stated, in relevant

part:

> [Martino]: . . . As communicated, we've begun what's called a gap analysis to
> determine what we have in place and what remains to be completed and
> assembled for that BLA. And the guidance that we've given is end of Q2 of next
> year.  *We've also indicated that we would expect resources from a partner to*
> *potentially help us accelerate that schedule*. . . .
>
> [Analyst]: Next question. Do you anticipate that the same or a different partner
> will handle the implementation of Ampion for different medical conditions?
> Example, one for knee, one for long-term COVID patient?
>
> [Martino]: Nic, I appreciate the question. And I think at this point, I have to repeat
> what we said on the last call, which is, *at this point in time, all potential sizes,*
> *shapes and flavors of partnerships are on the table. And I think once we have a*
> *heads of agreement in hand and can actually announce that, we'll be in a better*
> *position to provide clarity*.

104.    The statements in ¶ 103 above were false and/or misleading when made because

Ampio and Martino failed to disclose that no other pharmaceutical company would be interested in

partnering with Ampio for the development of Ampion because the AP-013 Trial did not

demonstrate efficacy for either of the Trial's primary endpoints.

**F.    The Truth Begins To Emerge**

105.    On April 20, 2022, after market close, Ampio announced that the FDA did not agree

with the Company's proposed change from the intent-to-treat population to the modified intent-to-

treat population for the primary endpoint analysis, that mITT is a substantive and material change to

the Protocol and Statistical Analysis Plan that is not in accordance with the Special Protocol

Assessment agreement, and that despite the COVID-19 related impact on patients and trial centers,

the Company should have sought the FDA's agreement on these changes prior to analyzing and

unblinding the data.  Most importantly, the FDA told Ampio that it did not agree that AP-013 could

serve as a second pivotal trial to support a BLA for Ampion based upon both the change in the

analysis population and the analysis of pain only instead of the original prespecified co-primary endpoints.

106.    Ampio did not dispute the FDA's conclusions, admitted that it would be "difficult to salvage AP-013 itself as a pivotal trial" and believed that the best path forward was likely to conduct a new Phase 3 trial.

107.    On this unexpected development, Ampio stock plunged 26.5% from a close of $0.34 per share on April 20, 2022 to $0.25 per share on April 21, 2022.

108.    Then, on May 16, 2022, after market close, Ampio announced that an independent special committee of the board of directors (the "Special Committee"), with the assistance of independent legal counsel, was in the process of conducting an internal investigation relating to the AP-013 Trial, among others.  The Company also disclosed that the Special Committee is "also is overseeing a review of unauthorized use of Ampion by individuals not participating in clinical trials. Ampion is an investigational drug not approved by FDA. Ampio instituted safeguards to cease this practice and engaged independent outside counsel to conduct a thorough review, which is ongoing.  The Company is currently in the process of working to ensure that the issue has been resolved, that appropriate mitigation measures have been implemented, and that this information is provided to FDA."

109.    That day, Ampio also filed its quarterly report for the first quarter of 2022 with the SEC on Form 10-Q (the "1Q 2022 10-Q").  The 1Q 2022 10-Q disclosed that Martino, and Stokely determined that the Company's disclosure controls were not effective, stating, in part:

> As of the end of the period covered by this report, we carried out an evaluation, under the supervision and with the participation of senior management, including the CEO and the CFO, of the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Exchange Act Rules 13a-15(b) and 15d-15(b). Based upon this evaluation, ***the CEO and the CFO concluded that our disclosure controls and procedures as of the end of the period covered by***

*this report were not effective due to the matters identified as part of the*
*Company's decision announced on May 16, 2022 to conduct an internal*
*investigation*, to be overseen by an independent special committee, as described
in Part II, Item 5 of this Quarterly Report on Form 10-Q.

110.    When this unexpected shocking development was disclosed, Ampio's stock price

dropped again, plunging 10% over two trading days from a closing price of $0.20 per share on May

16, 2022 to $0.18 per share on May 18, 2022.

111.    Then, on June 1, 2022, Ampio announced that it would be making changes to the

Company's management.  The Company issued a press release stating that on, May 28, 2022, the

board of directors decided to separate the roles of chair of the board and chief executive officer and

that David Bar-Or, Philip H. Coelho, and Richard B. Giles resigned as directors of the Company.

As well, the press release stated that, on May 31, 2022, Ampio terminated the employment of

Cherevka and Macaluso.

112.    The following day, on June 2, 2022, Ampio finally disclosed that the AP-013 Trial

did not provide an improvement in pain and function over the saline placebo, stating, in part,

"Compared to baseline, Ampion-treated patients have shown clear evidence of reduction of pain

and improvement in function as early as 2 weeks after dosing which lasted up to 24 weeks.

However, the saline control that Ampion was evaluated against in AP-013 and earlier trials is an

active control, not a placebo, and it showed benefit as well.  As a result, the pre-specified intent-to-

treat population analysis of AP-013 did not demonstrate a statistical benefit of Ampion when

compared with saline on either pain or function over the 12-week efficacy analysis period."

## VI.    THE TRUTH ABOUT AMPION AND AP-013 IS FINALLY DISCLOSED TO THE MARKET

113.    Before the market opened on August 3, 2022, Ampio issued a press release

containing a letter written by CEO Martino and Chairman of the Board, Kevin Buchi, discussing

the results of the internal investigation conducted by the Special Committee.  The letter disclosed

the following conclusions from the investigation:

> As it relates to the AP-013 clinical trial, the Special Committee's primary findings include that certain former Ampio executive officers and senior staff were aware, at the time of the per-protocol interim analysis in March 2020, that the AP-013 trial did not demonstrate efficacy for Ampion on its co-primary endpoints of pain and function; and that these former executives officers and senior staff did not fully report the results of the AP-013 trial and the timing of unblinding of data from the AP-013 trial. . . .

> As it relates to the unauthorized use of Ampion, the Special Committee's primary finding is that certain Ampio personnel, including a former executive officer and certain former directors, facilitated the provision of Ampion for unauthorized use. Ampio has worked to resolve this issue, including through the conduct of safety surveillance activities relating to the provision of Ampion for unauthorized use, implementation of appropriate mitigation measures (described below), and self-reporting to FDA.

114.    The letter also noted that the SEC and FDA had been informed about the

investigations, and discussed the efforts that Ampio has undertaken to address the information

uncovered by the investigation:

> The Company has taken the following actions based in part upon the investigations and the findings of the Special Committee:
>
> • Terminated the employment of two executive officers;
> • Restructured the Board of Directors through resignation of certain directors;
> • Separated the role of Chair of the Board and Chief Executive Officer;
> • Re-constituted the Company's Disclosure Committee with additional subject-matter experts;
> • Enhanced Company policies and procedures including those related to inventory management and distribution; and
> • Conducted company-wide training regarding appropriate use of Ampion while in the clinical trial stage.

115.    The Company also disclosed that there is no clinical pathway forward to continue

to develop Ampion, stating, in part:

> Regarding the status of Ampion™ development, in total, we have conducted seven Phase 2/3 trials, comprising more than 1,500 Ampion-treated patients and

more than 1,400 saline-treated patients. Ampion has consistently demonstrated a 30 percent reduction in pain and a 30 percent improvement in function across these trials. Unfortunately, so has the control element, saline. The saline response in our trials is consistent with the response in other published materials on osteoarthritis of the knee ("OAK") trials. . . .  Ampion has simply not demonstrated a sufficient therapeutic benefit versus saline to support another superiority trial and a noninferiority trial versus saline would not be commercially competitive.

Over the past several months we have undertaken an extensive meta-analysis of a merged database containing all clinical, laboratory and outcome data from all Ampion trials. This analysis has not identified either a sub-population of patients or combination of inclusion/exclusion factors that predicts a trial design where there would be a reasonable expectation for Ampion to outperform saline control. . . .

\* \* \*

Based on this extensive analysis, we do not believe that conducting an eighth, and likely a confirmatory ninth, pivotal trial for Ampion is a good use of the Company's cash and resources.

116.    When the market opened after the bombshell disclosure, Ampio's stock price dropped a whopping 37.5% from a close of $0.16 to close at $0.10 per share on August 3, 2022.

117.    Analysts reactive negatively to this announcement.  On August 5, 2022, Alliance Global Partners cut Ampio's rating to neutral and removed the price target and projections for the Company.  Alliance explained that the "[s]pecial investigation revealed some questionable reporting & materials handling practices" and that the "internal investigation reveal[ed] deeper issues than anticipated with Ampion[.]"  That same day Jefferson Research lowered its rating from Buy to Hold and lowered its earnings quality from Weak to Weakest.

118.    Several days later, on August 9, 2022, Ampio filed its financial report for the second quarter of 2022 with the SEC on Form 10-Q.  In the report, the Company provided more information on the inadequacies of its disclosure controls in place during the Class Period, stating:

As of the end of the report covered by the Quarterly Report on Form 10-Q for the period ending March 31, 2022, we disclosed in Part II, Item 4 that we carried out an evaluation, under the supervision and with the participation of senior management, including the CEO and the CFO, of the effectiveness of our disclosure controls and procedures pursuant to Exchange Act Rules 13a-15(b) and 15d-15(b). Based upon this evaluation, the CEO and the CFO concluded that our disclosure controls and procedures as of the end of the period covered by that report were not effective due to the matters identified as part of the Company's decision announced on May 16, 2022 to conduct internal investigations, to be overseen by an independent special committee, as further described in Part II, Item 5 of the Quarterly Report on Form 10-Q for the quarter ending March 31, 2022.

During the quarter ended June 30, 2022, and as a result of the lack of effectiveness regarding the disclosure controls and procedures resulting from the matters identified and disclosed in the Quarterly Report on Form 10-Q for the period ended March 31, 2022, the Company implemented several changes with the intention of improving the effectiveness of the Company's disclosure controls and procedures.

119.    On October 12, 2022, the SEC entered an order directing private investigation and designating officers to take testimony to determine whether Ampio or any other entities or persons have engaged in any violations of the federal securities laws.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

### A.    *Respondeat Superior* And Agency Principles Apply

120.    Ampio is liable for the acts of the Individual Defendants and other Company officers, directors, employees, and agents under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment or agency with the authority or apparent authority to do so. The scienter of the Individual Defendants and other Company officers, directors, employees, and agents is similarly imputed to Ampio under *respondeat superior* and agency principles.

**B.      Defendants Knew Or Were Reckless In Not Knowing That The AP-013 Trial Had Been Unblinded And Did Not Demonstrate Efficacy**

121.    Ampio admitted in its August 3, 2022 letter to stockholders that certain of Ampio's former "executive officers and senior staff *were aware*, *at the time of the per-protocol interim analysis in March 2020*, *that the AP-013 trial did not demonstrate efficacy for Ampion* on its co-primary endpoints of pain and function[.]"  Macaluso and Cherevka were necessarily the executive officers referred to in the announcement because the August 3, 2022 letter says Ampio terminated two executive officers based in part on the Special Committee's investigation's findings.  *Id.* Macaluso and Cerevka were the only executive officers terminated between the announcement of the investigation and the August 3, 2022 letter.

122.    Defendants also knew or were reckless in not knowing that the AP-013 Trial showed that Ampion was not effective because they are involved in the testing.  CW2 stated that for about three months CW2 worked closely with an individual from the contract company, called MedSource (which had been contracted by Ampio to conduct the trial).  CW2 had a discussion with this employee sometime in February or March 2020 (when CW2 was traveling to the clinical sites), right before the interim analysis.  During this discussion, the MedSource employee told CW2 that after reviewing a large quantity of data from the trial, the employee did not believe there was a significant difference in the patient profiles.  The MedSource employee told CW2 that she was uncertain as to how the trial was progressing and she was not confident of the efficacy of the medicine.

123.    CW2 also stated that Cherevka was involved in the AP-013 trial, including for part of the time, contacting the hospitals. CW2 also stated that Cherevka and Macaluso communicated with the FDA, because there were meetings where they provided business updates to the

employees, including details about communications they had with the FDA. CW1 also stated that Cherevka interacted with the FDA.

124.    CW3 stated that he communicated with Cherevka about the AP-013 trial including meetings, phone calls and emails, mostly about logistics, including randomization of patients, the number of patients in the trial, schedules and site issues. CW3 stated that Cherevka shared a concern about how the data was being collected. CW3 stated that the staff at the sites had to be retrained, which was probably in late 2019. CW3 said this was directed by Cherevka (and another Ampio representative) during a meeting. CW3 explained that a clinical evaluation had to be performed at the sites to collect data that would determine the efficacy of the drug. CW3 said that there was difficulty measuring or scaling the data (*i.e.*, the patient's pain levels) because it was subjective and they thought it was being done differently by different staff members. CW3 said that Ampio personnel were seeing more variance in the data than they expected and thought that some of the data was erroneous. They thought it was necessary to retrain the sites regarding how to collect the data to make sure the data was being measured consistently. CW3 said that part of the training included ensuring that the same staff member who performed the initial evaluation on a patient also performed the subsequent evaluations.

125.    Therefore, for the entirety of the Class Period, Macaluso and Cherevka knew that the AP-013 Trial data had been unblinded to them and that the unblinded data showed that the Trial did not demonstrate efficacy for either of its primary endpoints.

126.    Armed with knowledge that the AP-013 Trial was unsuccessful and demonstrated that Ampion was not effective, Macaluso and Cherevka were also aware that no other manufacturing company would be interested in partnering with Ampio to develop a failed drug.

**C.    Defendants Knew Or Were Reckless In Not Knowing That Ampio Employees Facilitated The Unauthorized Use Of Ampion**

127.    Ampio also admitted in its August 3, 2022 letter to stockholders that "certain Ampio personnel, including a former executive officer and certain former directors, facilitated the provision of Ampion for unauthorized use" during the Class Period.  Either Macaluso or Cherevka is the former executive officer referred to in the letter, and Bar-Or, Coelho, and Giles are the directors referred to in the letter because the letter says Ampio terminated two executive officers and restructured the Board of Directors through resignation of certain directors based in part on the Special Committee's investigation's findings.  *Id.*  Macaluso and Cerevka were the only executive officers terminated, and Bar-Or, Coelho, and Giles were the only directors who resigned between the announcement of the investigation and the August 3, 2022 letter.

128.    CW1 stated that Macaluso did not have knowledge about pharmaceutical manufacturing and wanted to do things "fast and cheap" so he tried to "cut corners."

129.    Therefore, either Macaluso or Cherevka, and Bar-Or, Coelho, and Giles were aware or reckless in not knowing that they were not in compliance with the Company's Code of Ethics because they had violated the federal regulations banning the distribution of pharmaceutical products that have not yet been approved by the FDA.

**D.    Defendants Knew Or Were Reckless In Not Knowing That Ampio's Disclosure Controls Were Not Effective**

130.    Macaluso, Cherevka, Bar-Or, Coelho, and Giles were aware that Ampio's disclosure controls and procedures were not sufficient because the Company failed to disclose that they had unblinded the data from the AP-013 Trial and determined that it was not successful and that they were facilitating the unauthorized use of Ampion.  These employees knew that Ampio's disclosure controls and procedures failed to compel the disclosure of this information.

131.    Moreover, Stokely and Martino certified in Ampio's SEC filings that they had

"*carried out an evaluation*, . . . , *of the effectiveness of the design and operation of our disclosure

controls and procedures pursuant to Exchange Act Rules 13a-15(b) and 15d-15(b)*."  Rule 13a-

15(e), provides the following:

> the term *disclosure controls and procedures* means controls and other procedures
> of an issuer that are designed to ensure that information required to be disclosed
> by the issuer in the reports that it files or submits under the Act (15 U.S.C. 78a *et
> seq.*) is recorded, processed, summarized and reported, within the time periods
> specified in the Commission's rules and forms. Disclosure controls and
> procedures include, without limitation, controls and procedures designed to
> ensure that information required to be disclosed by an issuer in the reports that it
> files or submits under the Act is accumulated and communicated to the issuer's
> management, including its principal executive and principal financial officers, or
> persons performing similar functions, as appropriate to allow timely decisions
> regarding required disclosure.

132.    Therefore, as part of their evaluation, they had a duty to monitor the material events

at Ampio to ensure that information was being properly reported to the market.  They were reckless

in failing to discover and disclose Macaluso's and Cherevka's improper behavior when they had a

duty to ensure that activity of that nature was being reported to the market.

**E.     Ampion Was Ampio's Core Operation**

133.    Because the fraud alleged herein relates to the core business of Ampio, knowledge of

the facts underlying the fraudulent scheme may be imputed to the Individual Defendants.  Indeed,

Ampio repeatedly acknowledged that it is "a clinical stage company without any products that are

approved for commercial sale and [its] business is dependent on the success of Ampion.  If Ampion

does not receive regulatory approval or is not successfully commercialized, [its] business, including

[its] ability to generate revenues from product sales, is likely to be harmed."  Ampio

Pharmacueticals, Inc., Annual Report (Form 10-K) 23 (Mar. 9, 2022).

134.    Therefore, the Individual Defendants, as senior level executives and/or directors,

were in such positions at the Company to access all material, non-public information concerning the

Company's sole pharmaceutical product under development.  Given the importance of the AP-013

Trial to the FDA approval of Ampion, the Individual Defendants would have been aware of, or

recklessly disregarded, that Macaluso, Cherevka, and certain senior employees viewed the

unblinded Trial data in March 2020, whether the Trial data was unblinded, whether the Trial data

demonstrated efficacy, and whether the drug was being distributed to individuals outside of the

Trial, and that their statements were false and/or misleading when made.

135.     Ampio is a small company.  When the Class Period began, Ampio had only 16 full-

time employees.  Ampio Pharmaceuticals, Inc., Annual Report (Form 10-K) 17 (Mar. 3, 2021).

When the Class Period ended, Ampio had even fewer employees: as of December 31, 2022, Ampio

had only eight full-time employees.  Ampio Pharmaceuticals, Inc., Annual Report (Form 10-K) 7

(Mar. 27, 2023).

### F.     Ampio's Financial Motive

136.     During the Class Period, Defendants were motivated to artificially inflate Ampio's

stock price because doing so allowed Ampio to continue to fund its operation through equity raises,

as it had no operating revenue.

137.     As Ampio stated in its Form 10-K for the year ended 2020, shortly after the

beginning of the Class Period, there was "substantial doubt about the Company's ability to continue

as a going concern."  As of December 31, 2020, around the beginning of the Class Period, the

Company had cash and cash equivalents of $17.3 million and a net loss of $15.9 million.  Its

operating expenses were approximately $15.8 million and its accumulated deficit was $200.5

million.  Things only got worse as time went on.  Ampio's operating expenses in 2021 increased by

$4.7 million, its net loss increased to $17.1 million, and its accumulated deficit grew to $217.6

million.

138.     One option Ampio had to raise funding was through its "at the market" ("ATM") equity offering program, entered into in February 2020 with two agents.  Pursuant to the ATM sales agreement, the Company may offer to sell shares of its common stock having an aggregate offering price up to $50 million to the public through the agents until (i) each agent declines to accept the terms for any reason, (ii) the entire amount of shares has been sold, or (iii) the Company suspends or terminates the Sales Agreement.

139.     Ampio raised funds through the ATM in 2020 and 2021.  By the end of 2021, however, Ampio had only $13 million left to raise on the existing ATM, so it opted to enter into a registered direct offering which closed on December 16, 2021.  Through this offering, the Company was able to raise $21 million in net proceeds by offering 25 million shares of common stock and warrants to purchase up to 15 million shares of common stock for a combined price of $0.90 per share.  As Defendant Martino explained in the December 16, 2021 letter to shareholders, the Company opted for a dilutive share offering instead of using the existing ATM because (1) the maximum amount Ampio could raise with the existing ATM is $13 million, which would not support its strategic objectives; and (2) there is no guarantee it could raise $13 million because it is "at-the-market," meaning there was no guarantee they could get an acceptable stock price, while the registered direct offering was $0.90/share.

G.     **Defendants' Experience And Education**

140.     During the Class Period, Defendants were highly experienced in the pharmaceutical and biotechnology industries, and were therefore well aware that their statements regarding the unblinding and success of the AP-013 trial, the potential for partnership with a drug manufacturing company, the ethical and legal conduct of Ampio's employees, and the efficacy of Ampio's disclosure controls were false and/or misleading and that material information had been omitted.

141.    As set forth below, Defendants are sophisticated executives and directors who are

well-versed in the customs and practices of the pharmaceutical industry and corporate finance.  For

example, the Company's 2021 proxy statement says that Defendant Macaluso's "experience in

executive management and marketing within the pharmaceutical industry, monetizing company

opportunities and corporate finance led to the conclusion of [Ampio's] Board that he should serve

as a director of our Company."  Specifically, Defendant Macaluso founded Ampio's predecessor,

DMI Life Sciences, Inc. ("DMI"), and served as Ampio's CEO from January 2012 until November

2021, Chairman of the Board from May 2010 until November 2021, and as a director and advisor to

the CEO from November 2021 until his termination on May 31, 2022.  He also served as a board

member of Aytu Bioscience since April 2015, and as president, CEO, and director of Isolagen, Inc.

at various times from June 2001 to April 2005.

142.    Defendant Cherevka started at Ampio in January 2013 and had multiple roles prior

to her final role as COO, which she served in from September 2017 until her termination on May

31, 2022.   Before serving as COO, Cherevka served as Vice President of Operations and oversaw

the clinical, regulatory, and manufacturing operations.  She also previously served as Director of

Clinical Trials and then Senior Director of Clinical Trials.  Cherevka has a B.A. degree from

California State University, Chico, and an M.S. degree in biomedical and molecular sciences

research from King's College London.  She is also a member of the Parenteral Drug Association,

Colorado Bioscience Association, the International Society of Pharmaceutical Engineers, and a

board member of the Professional Science Master's in Biomedical Sciences program at the

University of Denver.

143.    Defendant Martino is described in the 2022 Proxy as having "extensive experience

in life sciences and his experience as the [CEO] and director of other pharmaceutical companies,

45

both public and private, leading drug development from preclinical through Phase 3 clinical trials, transacting mergers, and leading capital raises are attributes that qualify him to serve as a member of our Board."  Specifically, Martino was appointed CEO on November 22, 2021 and started as a director in October 2021.  He previously served as President, CEO, and a director of HemaFlo Therapeutics, Inc., a company focused on the treatment of acute kidney injury, since January 2016. Before that, Martino was President and CEO of Ambit Biosciences, focused on the development of a leukemia drug, from November 2011 to 2014, during which time Ambit initiated a large multinational Phase III study, secured $25 million in private financing, completed a $90 million initial public offering, and was sold to another pharmaceutical company for $450 million in cash plus future milestone payments.

144.    Defendant Stokely has served as CFO and Secretary since July 2019 and has more than 30 years of experience in finance and accounting.  According to the 2022 Proxy statement, before joining Ampio, he "spent the majority of his career in positions of financial leadership within both publicly traded and privately held pharmaceutical companies."

145.    Defendant Bar-Or, M.D., served as a director from March 2010 until his departure on May 28, 2022.   The 2021 Proxy states that his "medical training, extensive involvement, and inventions in researching and developing Ampion®, and leadership role in his hospital affiliations led to the conclusion of our Board that he should serve as a director of the Company." Specifically, Defendant Bar-Or is the founder of Ampio and was principally responsible for all patented and proprietary technologies.  *Id.*

146.    Defendant Coelho served as director from April 2010 until his departure on May 28, 2022.  The 2021 Proxy states that "Coelho's long tenure as a CEO of a public medical device company, as director of a public pharmaceutical company, prior and current public company board

experience, and knowledge of corporate finance and governance as an executive and director, as well as his demonstrated success in developing patented technologies, led to the conclusion of our Board that he should serve as a director of our Company."

147. Defendant Giles served as director from August 2010 until his departure on May 28, 2022. The 2021 Proxy states that "Giles' experience in executive financial management, accounting and financial reporting, corporate accounting and internal controls led to the conclusion of our Board that he should serve as a director of our Company." Specifically, he served as CFO and Treasurer of Ludvik Electric Co. since 1985 and in that role oversees accounting, risk management, financial planning and analysis, financial reporting, regulatory compliance, and tax-related accounting functions. Before joining Ludvik, Giles was an Audit Partner for three years with Higgins Merritt & Company, a CPA firm, and before that, he served as an Audit Manager and a member of the audit staff of Price Waterhouse. During that time, he participated in a number of public company audits. He is a member of the American Institute of Public Accounts, the Colorado Society of Certified Public Accountants, and the Construction Financial Management Association.

**H.** **Defendants' Certifications Pursuant To The Sarbanes-Oxley Act Of 2002 Demonstrate Scienter**

148. Defendants Macaluso and Stokely signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that they filed with the SEC in connection with the filing of Ampio's 2020 10-K. *See* Ampio Pharmaceuticals, Inc., Annual Report (Form 10-K), Exs. 31.1 and 31.2 (Mar. 3, 2021). The certifications state, in relevant part:

1. I have reviewed this Annual Report on Form 10-K of Ampio Pharmaceuticals, Inc. for the year ended December 31, 2020;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

149.    Defendants Martino and Stokely signed SOX certifications filed with the SEC in connection with the filing of the 2021 10-K.  *See* Ampio Pharmaceuticals, Inc., Annual Report (Form 10-K), Ex. 31.1 and 31.2 (Mar. 29, 2022).  The certifications state, in relevant part:

1. I have reviewed this Annual Report on Form 10-K of Ampio Pharmaceuticals, Inc. for the year ended December 31, 2021;
2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

## VIII.    LOSS CAUSATION

150.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs and the Class to suffer substantial damages.

151.    During the Class Period, Plaintiffs and other Class members purchased Ampio common stock at artificially inflated prices and suffered substantial losses and damages when the true facts concealed by Defendants' fraud were revealed and/or when the risks concealed by those undisclosed facts materialized. The price of Ampio common stock declined significantly causing Plaintiffs and other Class members to suffer losses and damages when Defendants' misrepresentations, and/or information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the foreseeable risks that had been fraudulently concealed by Defendants materialized.

152.    Defendants made false and misleading statements and material omissions regarding the unblinding and success of the AP-013 Trial, the potential for partnership with a drug manufacturing company, the ethical and legal conduct of Ampio's employees, and the efficacy of Ampio's disclosure controls.  On the strength of these false and misleading statements and material omissions, the price of the Company's common stock was artificially inflated to a Class Period high of $2.49 on February 12, 2021.  Those misrepresentations and omissions that were not immediately

followed by an upward movement in the price of the Company's securities served to maintain the share price at artificially inflated levels by maintaining and supporting a false perception of Ampio's business, operations, performance, and prospects. When these statements were corrected and/or the risks concealed by them materialized, investors suffered losses as the price of Ampio common stock declined.

153.    The true facts and risks regarding Ampio's AP-013 Trial data and executive misconduct which were omitted and/or misrepresented by Defendants eventually caused the price of Ampio's common stock to decline on three occasions, thereby causing harm to investors.

154.    First, Defendants' statements were partially corrected, and the risks concealed by the undisclosed facts regarding Ampio's AP-013 Trial data and executive misconduct materialized on April 20, 2022 when, after market close, Ampio announced that the FDA did not agree with the Company's proposed change from the intent-to-treat population to the mITT population for the primary endpoint analysis, that the mITT is a substantive and material change to the Protocol and Statistical Analysis Plan that is not in accordance with the SPA agreement, that Ampio should have sought the FDA's agreement on these changes before analyzing and unblinding the data, and that AP-013 could not serve as a second pivotal trial for Ampion.  This caused investors to suffer losses because the price of Ampio's common stock plunged 26.5% from a close of $0.34 per share on April 20, 2022 to $0.25 per share on April 21, 2022.

155.    Second, Defendants' statements were further corrected, and the risks concealed by the undisclosed facts regarding Ampio's AP-013 Trial data and executive misconduct further materialized on May 16, 2022 when Ampio announced that the Special Committee, with the assistance of independent legal counsel, was in the process of conducting an internal investigation relating to the AP-013 Trial.  Ampio also disclosed in its quarterly report filed that day that its

disclosure controls and procedures were not effective due to the matters being investigated by the
Special Committee.  This caused investors to suffer losses because the price of Ampio's common
stock plunged 10% over two trading days from a closing price of $0.20 per share on May 16, 2022
to $0.18 per share on May 18, 2022.

156.    Third, Defendants' statements were further corrected, and the risks concealed by the
undisclosed facts regarding Ampio's AP-013 Trial data and executive misconduct further
materialized on August 3, 2022 when Ampio announced that (1) the Special Committee found that
certain of Ampio's former executive officers and senior staff were aware, at the time of the per-
protocol interim analysis in March 2020, that the AP-013 trial did not demonstrate efficacy for
Ampion on its co-primary endpoints; (2) the Special Committee found that certain Ampio
personnel, including a former executive officer and certain former directors, facilitated the
provision of Ampion for unauthorized use; and (3) Ampio would discontinue development of
Ampion because the clinical trial data revealed that the drug failed to outperform the saline control.
This caused investors to suffer losses because the price of Ampio commons stock plunged 37.5%
from a close of $0.16 to close at $0.10 per share on August 3, 2022.

157.    Accordingly, as a result of their purchases of Ampio's publicly traded common stock
during the Class Period, Plaintiffs and other members of the Class suffered economic losses and
damages.

## IX.    CONTROL PERSON LIABILITY

158.    The Individual Defendants are liable as direct participants with respect to the wrongs
complained of herein.  In addition, the Individual Defendants, by reason of their status as senior
executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a)
of the Exchange Act, and each had the power and influence to cause the Company to engage in the

unlawful conduct complained of herein.  Because of their positions of control, the Individual

Defendants were able to and did, directly or indirectly, control the conduct of Ampio's business.

159.    Specifically, because of their positions within the Company, the Individual

Defendants possessed the power and authority to control the contents of Ampio's SEC filings,

annual and quarterly reports, press releases, conference calls, and presentations to securities

analysts, money and portfolio managers and institutional investors, *i.e.*, the market, including those

containing the materially false and misleading statements and omissions of material fact alleged

herein. Each of the Individual Defendants, by reason of his/her respective management or board

position, had the ability and opportunity to review copies of the Company's SEC filings, reports,

press releases, and other statements alleged herein to be misleading, prior to, or shortly after their

issuance or to cause them to be corrected.

160.    By virtue of their positions, the Individual Defendants had access to material non-

public information.  Each of the Individual Defendants knew or recklessly disregarded the fact that

the adverse facts specified herein had not been disclosed and were being concealed from the public,

and that the positive representations which were being made were then materially false and

misleading.

## X.    APPLICABILITY OF THE FRAUD ON THE MARKET DOCTRINE

161.    The false and/or misleading statements alleged herein were material and public and

at all relevant times the market for Ampio's common stock was an efficient market for the

following reasons, among others:

a)    Ampio's common stock was listed on the New York Stock Exchange

American, a highly efficient market;

b)      As a registered and regulated issuer of securities, Ampio filed periodic reports with the SEC, in addition to frequent voluntary dissemination of information;

c)      Ampio regularly communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services;

d)      The market reacted to public information disseminated by Ampio; and

e)      At least 4 analysts followed Ampio's business and wrote reports which were publicly available and affected the marketplace.

162.    As a result of the above, the market for Ampio's common stock promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the securities' market prices. The historical trading prices and volumes of Ampio common stock are incorporated herein by reference.

163.    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to overvalue Ampio's common stock. Without knowledge of the misrepresented or omitted facts, Plaintiffs and other members of the Class purchased Ampio common stock between the time that Defendants made the material misrepresentations and omissions and the time that the truth or concealed risk was revealed, during which time the price of Ampio's securities was artificially inflated by Defendants' misrepresentations and omissions. Thus, a presumption of reliance applies.

## XI.    AFFILIATED UTE PROVISION

164.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII.    NO SAFE HARBOR

165.    The safe harbor provisions for the forward-looking statements under the Private Securities Litigation Reform Act of 1995 are applicable only under certain circumstances that do not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.

166.    First, many of the identified false and misleading statements and omissions herein are not forward-looking statements, but instead are statements of current or historic fact, or are actionable in context because they omit then-existing material facts.

167.    Second, many of the identified false and misleading statements herein were not identified as forward-looking statements.

168.    Third, to the extent there were any forward-looking statements that were identified as such at the time made, those statements also contained statements of present or past facts and so are not entitled to protection under the safe harbor.

169.    Fourth, to the extent there were any forward-looking statements that were identified as such at the time made, there were no meaningfully cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Such statements were also not accompanied by cautionary language that was meaningful because such warnings or "risk" factors contained in, or incorporated by reference in, the relevant press releases, SEC filings, earnings calls, or other public statements described herein were general, "boilerplate" statements of risk that would affect any pharmaceutical company, and misleadingly contained no factual disclosure of any of the specific details concerning Ampio's AP-013 Trial results, employee misconduct, or similar important factors that would give investors adequate notice of such risks.

170.    Fifth, to the extent there were any forward-looking statements, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or, by reason of what the speaker failed to note, was materially false and/or misleading, and/or that each statement was authorized and/or approved by a director and/or executive officer of Ampio who actually knew that each such statement was false or misleading when made.

## XIII.  CLAIMS FOR RELIEF

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Against Defendants**

171.    Plaintiffs re-allege each allegation above as if fully set forth herein.

172.    This claim is brought under Section 10(b) of the Exchange Act (15 U.S.C.

§ 78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), against Defendants.

173.    During the Class Period, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by making the false and misleading statements specified herein, including the statements in SEC filings, presentations, press releases, and conference calls concerning (1) the unblinding and success of the AP-013 Trial; (2) the potential for partnership with a drug manufacturing company; (3) the ethical and legal conduct of Ampio's employees; and (4) the efficacy of Ampio's disclosure controls reviewed by Defendants, whose truth they knowingly or recklessly disregarded when they failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not false and misleading.

174.    During the Class Period, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c) promulgated thereunder by employing devices, schemes, and artifices to defraud and engaging in acts, practices, and a course of conduct that operated as a fraud or deceit upon Plaintiffs and other members of the Class in that Defendants concealed the adverse patient data from the investing public.

175.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's operations and financial condition as reflected in the misrepresentations and omissions set forth above.

176.    Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain

and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

177.    As a result of Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiffs and the Class members were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

178.    Ampio is liable for the acts of the Individual Defendants and other Company personnel referenced herein under the doctrine of *respondeat superior*, as those persons were acting as the officers, directors, and/or agents of Ampio in taking the actions alleged herein.

179.    Plaintiffs and Class members purchased Ampio common stock, without knowing that Defendants had misstated or omitted material facts about the Company's operations and financial performance or prospects.  In so doing, Plaintiffs and Class members relied directly or indirectly on false and misleading statements made by Defendants, and/or an absence of material adverse information that was known to Defendants or recklessly disregarded by them but not disclosed in Defendants' public statements.  Plaintiffs and Class members were damaged as a result of their reliance on Defendants' false statements and misrepresentations and omissions of material facts.

180.    At the time of Defendants' false statements, misrepresentations and omissions, Plaintiffs and Class members were unaware of their falsity and believed them to be true.  Plaintiffs and the Class would not otherwise have purchased Ampio common stock had they known the truth about the matters discussed above.

181.    Plaintiffs are filing this action within two years after discovery of the facts

constituting the violation, including facts establishing scienter and other elements of Plaintiffs'

claims, and within five years after the violations with respect to Plaintiffs' investments.

182.    By virtue of the foregoing, Defendants have violated § 10(b) of the Exchange Act

and Rule 10b-5 promulgated thereunder.

183.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the

Class have suffered damages in connection with their purchase of Ampio common stock.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act
Against the Individual Defendants**

184.    Plaintiffs reallege each allegation above as if fully set forth herein.

185.    This Count is asserted against the Individual Defendants for violations of Section

20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

186.    As set forth above, Ampio committed a primary violation of Section 10(b) of the

Exchange Act by knowingly and/or recklessly disseminating materially false and misleading

statements and/or omissions throughout the Class Period as well as by participating in a scheme

to conceal the adverse patient data from the investing public.

187.    Each of the Individual Defendants, by reason of their status as senior executive

officers and/or directors of Ampio, directly or indirectly, controlled the conduct of the Company's

business and its representations to Plaintiffs and the Class, within the meaning of §20(a) of the

Exchange Act.  The Individual Defendants directly or indirectly controlled the content of the

Company's SEC statements, press releases, and other statements related to Plaintiffs' and the Class'

investments in Ampio common stock within the meaning of § 20(a) of the Exchange Act.

Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

188.    The Individual Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases.  Because of their close involvement in the every-day activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

189.    The Individual Defendants knew or recklessly disregarded the fact that Ampio's representations were materially false and misleading and/or omitted material facts when made.  In so doing, the Individual Defendants did not act in good faith.

190.    By virtue of their high-level positions and their participation in and awareness of Ampio's operations and public statements, the Individual Defendants were able to and did influence and control Ampio's decision-making, including controlling the content and dissemination of the documents that Plaintiffs and the Class contend contained materially false and misleading information and on which Plaintiffs and the Class relied.

191.    The Individual Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

192.    As set forth above, Ampio committed a primary violation of Section 10(b) of the Exchange Act by knowingly and/or recklessly disseminating materially false and misleading statements and/or omissions throughout the Class Period as well as by participating in a scheme to conceal the adverse patient data from the investing public.

193.    As a direct and proximate result of the Individual Defendants' wrongful conduct,

Plaintiffs and the Class suffered damages in connection with their purchase of Ampio common

stock.

## XIV.  CLASS ACTION ALLEGATIONS

194.    Plaintiffs bring this action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules

of Civil Procedure on behalf of themselves and all persons and entities other than Defendants that

purchased or otherwise acquired Ampio common stock between December 29, 2020 and August 2,

2022, inclusive, and were damaged thereby, seeking to pursue remedies under the Exchange Act.

195.    Excluded from the Class are Defendants named herein, members of their immediate

families, any firm, trust, partnership, corporation, officer, director or other individual or entity in

which a Defendant has a controlling interest or which is related to or affiliated with any of the

Defendants, and the legal representatives, heirs, successors-in-interest or assigns of such excluded

persons.

196.    The members of the Class are so numerous that joinder of all members is

impracticable.  During the Class Period, Ampio common stock was actively traded on the NYSE

American, which is an efficient market.  While the exact number of Class members cannot be

determined at this early stage, Plaintiffs believe that thousands of people held Ampio common

stock during the Class Period.  Record owners and other members of the Class may be identified

from records maintained by Ampio or its transfer agent and may be notified of the pendency of this

action by mail, using a form of notice similar to that customarily used in securities class actions.

197.    Plaintiffs' claims are typical of the claims of the other members of the Class.  All

members of the Class were similarly affected by Defendants' allegedly wrongful conduct in

violation of the Exchange Act as complained of herein.

198.    Plaintiffs will fairly and adequately protect the interests of the Class and have

retained counsel competent and experienced in class action and securities litigation.  Plaintiffs have

no interests that are contrary to or in conflict with those of the Class.

199.    Common questions of law and fact exist as to all members of the Class, and

predominate over any questions solely affecting individual members of the Class.  The questions of

law and fact common to the Class include, *inter alia*:

a)    Whether the federal securities laws were violated by Defendants' acts as

alleged herein;

b)    Whether statements made by Defendants during the Class Period contained

untrue statements of material fact and/or omitted to state material facts necessary in order to make

the statements made, in light of the circumstances under which they were made, not misleading;

c)    Whether and to what extent Defendants' material untrue statements and/or

omissions of material fact caused the market price of Ampio's common stock to be artificially

inflated during the Class Period;

d)    Whether Defendants acted with the requisite level of scienter with respect to

the Exchange Act claims;

e)    Whether the Individual Defendants were controlling persons of Ampio;

f)    Whether reliance may be presumed pursuant to the *Affiliated Ute*

presumption or fraud-on-the-market doctrine; and

g)    Whether the Class members have sustained damages, and if so, the proper

measure of damages.

200.    Plaintiffs know of no difficulty that will be encountered in the management of this

action that would preclude its maintenance as a class action.

201.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because, among other things, joinder of all members of the Class is impracticable.  In addition, since the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it nearly impossible for members of the Class to bring individual actions.

## XV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for relief and judgment including:

A.    Determining that Counts I through II of this action are a proper class action under Federal Rules of Civil Procedure 23, certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs' counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.    Awarding rescissory damages in favor of Plaintiffs and the other Class members where appropriate against all Defendants, jointly and severally, for all injuries sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

D.    Awarding extraordinary, equitable, and/or injunctive relief as permitted by law (including, but not limited to, rescission);

E.    Awarding Plaintiffs and the Class their costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

F.    Awarding such other and further relief as may be just and proper.

## XVI. JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury on all triable claims.

Dated:     October 16, 2023          **FARUQI & FARUQI, LLP**

By: _/s/ James M. Wilson, Jr.___

James M. Wilson, Jr.
Robert W. Killorin
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: jwilson@faruqilaw.com
           rkillorin@faruqilaw.com

*Attorneys for Lead Plaintiffs*