IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-2105-WJM

TAO WANG, et al.,

      Plaintiffs,

      vs.

AMPIO PHARMACEUTICALS, INC. et al.,

      Defendants.

-----------------------------------------------------------------

REPORTER'S TRANSCRIPT

Fairness Hearing

-----------------------------------------------------------------

      Proceedings before the HONORABLE WILLIAM J. MARTINEZ, Judge, United States District Court for the District of Colorado, commencing on the 19th day of February, 2025, in Courtroom A801, United States Courthouse, Denver, Colorado.

APPEARANCES

For the Plaintiffs:
KATHERINE M. LENAHAN and JAMES M. WILSON, JR., Faruqi & Faruqi LLP, 685 Third Avenue, 26th Floor, New York, NY 10017

For Ampio Pharmaceuticals, Inc., and Michael A. Martino:
M. NORMAN GOLDBERGER and PATRICK G. COMPTON, Ballard Spahr LLP, 1225 17th Street, Suite 2300, Denver, CO 80202

For Holli Cherevka:
EMILY R. GARNETT, Brownstein Hyatt Farber Schreck LLP, 675 15th Street, Suite 2900, Denver, CO 80202

For David Bar-Or:
BRIAN N. HOFFMAN, Holland & Hart, 555 17th Street, Suite 3200, Denver, CO 80201

Reported by KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room A259, Denver, CO 80294, (303)335-2358

Proceedings reported by mechanical stenography; transcription produced via computer.

22-cv-2105-WJM    Fairness Hearing    02-19-2025

P R O C E E D I N G S

(Proceedings commenced at 10:33 a.m.)

THE COURT:  All right.  We are on the record in civil action number 22-cv-2105, Tao Wang, et al, plaintiffs, versus Ampio Pharmaceuticals, Inc., et al, defendants.  I will take appearances of counsel.

MS. LENAHAN:  Good morning, Your Honor.  Katherine Lenahan of Faruqi & Faruqi, on behalf of the plaintiffs.

MR. WILSON:  And James Wilson, also from Faruqi & Faruqi.

THE COURT:  All right.  Good morning to the two of you.  For the defendants?

MR. GOLDBERGER:  Good morning, Your Honor.  Norman Goldberger for Ampio, Mr. Martino, and I think that's all I have today.

THE COURT:  Okay.

MR. COMPTON:  Patrick Compton as well on behalf of those same.

THE COURT:  All right.

MS. GARNETT:  Good morning, Your Honor.  Emily Garnett on behalf of defendant Holli Cherevka.

THE COURT:  Good morning.

MR. HOFFMAN:  Your Honor, Brian Hoffman on behalf of defendant David Bar-Or.

THE COURT:  Thank you for that.  Good morning to the

Kevin P. Carlin, RMR, CRR

22-cv-2105-WJM    Fairness Hearing    02-19-2025

four of you.  All right.  We are here for a fairness hearing on a proposed final settlement of this securities class action case.  Before me this morning are two motions: the lead plaintiff's motion for final approval of the class action settlement filed at ECF 100, as well as the lead counsel's motion for an award of attorneys' fees, reimbursement of expenses, and award to lead plaintiffs.

At this fairness hearing, I will consider and rule on the following: whether the settlement is fair, reasonable, and adequate, I will consider and rule on any objections, and I will consider and rule on the three matters raised in the second motion that I just referenced, and that being the award of attorneys' fees, the reimbursement of expenses, and award to the lead plaintiff.

At this hearing, per binding Circuit law, I must consider the following four factors in reviewing a proposed class action settlement: whether the proposed settlement was fairly and honestly negotiated, whether serious questions of law and fact exist placing the ultimate outcome of the litigation in doubt, whether the value of the immediate recovery outweighs the mere possibility of future relief after protracted and extensive litigation, and the judgment of the parties that the settlement is fair and reasonable.  This is from the Tenth Circuit's *Jones* case from 1984.

Specifically with respect to the fee and cost motion,

4

22-cv-2105-WJM    Fairness Hearing    02-19-2025

in my view, I have a duty to investigate the provisions of any proposed compromise or settlement of a class action, and including the obligation to explore the manner in which fees of class counsel are to be paid, and the dollar amount for such services.

And finally, with respect to a service award for class representatives, first let me clarify, Ms. Lenahan, throughout the papers that the plaintiff filed, there's a reference to service award for class representatives in the plural. I infer from the intent of the motion, though, is that the fee -- the entirety of the service fee award would go to -- is that a Mr. or Ms. Wang?

MS. LENAHAN: Mr. Wang.

THE COURT: Mr. Wang. And is that accurate?

MS. LENAHAN: Yes. That is accurate.

THE COURT: All right. So, no service award is sought for SynWorld Technologies Corporation?

MS. LENAHAN: That's correct. SynWorld is Mr. Wang's company.

THE COURT: Okay. Thank you. And with respect to that service award, I will be considering the actions the class representative took to protect the interests of the class, the degree to which the class has benefited from those actions, and the amount of time and effort the class representative expended in pursuing the litigation.

Kevin P. Carlin, RMR, CRR

5

22-cv-2105-WJM    Fairness Hearing    02-19-2025

So, the way we're going to proceed this morning is --
the way I generally handle these fairness hearings is to make a
record of what it is that brought us here this morning.  I'm
going to read into the record a summary background of the
litigation to date.  Then I will ask plaintiffs' counsel to take
the lectern to summarize why in plaintiffs' view the settlement
is -- including the attorneys' fees, costs, and service award to
the plaintiff representative are fair, reasonable, and adequate.

Then I will allow defense counsel to put on the record
their views as to those questions.  I will then consider whether
there are any -- between now and then, any objectors coming to
the courtroom to make an objection, and proceed to a summary of
the rulings I will be making in this case.

So, in terms of the general background of this
litigation that I want to put on the record, let me state as
follows:  During the class period, which was December 29, 2020,
to August 2nd of 2022, Ampio -- defendant Ampio was a
pre-revenue stage biopharmaceutical company.  It's lead product
candidate, Ampion, was being developed to treat osteoarthritis
of the knee.

Plaintiffs Tao Wang and SynWorld Technologies
Corporation allege that defendants violated sections 10(b) and
20(a) of the Securities Exchange Act of 1934 by materially
misrepresenting and omitting material facts regarding, among
other things, the latest trial of Ampion.  Plaintiffs allege

Kevin P. Carlin, RMR, CRR

22-cv-2105-WJM     Fairness Hearing     02-19-2025

that defendants knowingly and/or recklessly made the challenge statements without disclosing that Ampio employees engaged in what is alleged to be serious misconduct by prematurely viewing the drug trial results and distributing Ampion for a use that had not been approved by the FDA.

Plaintiffs further allege that the truth of the defendants' actions leaked out in a series of disclosures beginning in April of 2022, when the FDA rejected the company's attempt to salvage the trial by claiming that there was a subgroup of patients for whom Ampion was effective.  According to the plaintiffs, this revelation was filed by the disclosure that the company formed a special committee to investigate improper practices with respect to Ampion, which culminated in the August 3rd, 2022, quote/unquote, bombshell confirmation of certain executive officers' and directors' misconduct, and the admission that Ampion was ineffective for OAK, and that its development was being discontinued.

Plaintiffs allege that each disclosure of material new information to investors about Ampion and the company's improper practices caused material drops in Ampio's stock price from a class period high of $2.49 on the 12th of February of 2021 down to a low of ten cents at the close of the class period.

A few months after the class period, the Securities and Exchange Commission launched an investigation into Ampio's alleged wrongdoing and potential violations of federal

22-cv-2105-WJM     Fairness Hearing     02-19-2025

securities laws.  The initial class action complaint commencing this action was filed on the 17th of August of 2022.  After plaintiffs filed their amended complaint in August of 2023, the parties agreed to mediate in light of Ampio's, quote, dire financial situation, end quote.

On the 4th of January of 2024, the parties participated in an all-day mediation session conducted by one Robert E. Meyer of JAMS, and reached an agreement in principle to settle and release the pending claims in the action, subject to the completion of a confirmatory discovery.

Defendants thereafter produced over 25,000 documents, and plaintiffs interviewed two Ampio representatives to discuss the company's financial condition, the allegations in the amended complaint, and the defendants' defenses.  The confirmatory discovery assured plaintiffs and lead counsel that the settlement terms were fair, reasonable, and adequate -- this is according to the parties.  The parties then finalized the stipulation and agreement of the settlement, which was filed on the record at ECF 93.

On May 13th of last year, 2024, the plaintiffs filed an unopposed motion for an order to preliminarily approve the class action settlement.  In September of last year I preliminarily approved the settlement agreement as fair and reasonable, and certified a settlement class defined as follows: all persons who purchased or otherwise acquired Ampio common stock between

22-cv-2105-WJM     Fairness Hearing     02-19-2025

December 29, 2020, and August 2nd, 2022, inclusive, and were damaged thereby.

Excluded from the settlement class are defendants; members of the immediate family of any individual defendant; all subsidiaries and affiliates of Ampio and the current and former directors and officers of Ampio and its respective subsidiaries or affiliates; any firm, trust, partnership, corporation, or entity in which any defendant has a controlling interest; the legal representatives, agents, affiliates, heirs, successors, interests, or assigns of all such excluded parties; and finally excluded were any persons or entities who properly exclude themselves by filing a valid and timely request for exclusion from the class.

I also approved as to form, content, and manner of distribution lead plaintiff's proposed long form notice, postcard notice, claim form, and summary notice.

In a recent declaration, the class administrator represents it has to date mailed 685 postcard notices to potential class members directly, 3,489 nominee notice packets consisting of a cover letter and the postcard notice to known securities brokers or third party nominees who engaged in securities trading or representation, and in response to requests from nominees, 21,230 blank postcard notices to nominees to in turn distribute to their clients.

In total, the class administrator distributed --

22-cv-2105-WJM    Fairness Hearing    02-19-2025

represents to the Court that it distributed 25,404 copies of the postcard notice to potential class members and nominees. After the class administrator's efforts to identify an alternate address, 41 postcard notices and 146 nominee notice packets remained undeliverable.

In addition, since October 14th of 2024, the settlement telephone number has received 142 phone calls, with 122 of those routed to live agents. And since October 15th of 2024, the settlement website has received 2,318 unique visitors.

On the 28th of October of last year, the class administrator also caused the court-approved summary notice to be published in Investor's Business Daily, and transmitted over PR Newswire.

As of the 24th of January this year, 2025, the class administrator represents it has received 351 claim forms from individuals, 55 claim forms from nominees or third party filers on behalf of 23,772 clients for a total of 24,123 claimants, and zero requests for exclusion from the class.

The Court received no objections to the settlement agreement by the January 29th, 2025, deadline set forth in the preliminary approval order. Lead plaintiff's motion for final approval of the class action settlement, ECF 100, as I referenced before, and their motion for an award of attorneys' fees, reimbursement of expenses, and award to lead plaintiffs are unopposed.

Kevin P. Carlin, RMR, CRR

22-cv-2105-WJM    Fairness Hearing    02-19-2025

All right.  Who will be -- on behalf of plaintiffs be addressing this matter this morning?

MS. LENAHAN:  I will, Your Honor.  Katherine Lenahan.

THE COURT:  Okay.  Ms. Lenahan, if you will take the lectern, please.

MS. LENAHAN:  Thank you, Your Honor.

THE COURT:  If you will take the lectern.

MS. LENAHAN:  Oh.  I'm sorry.

THE COURT:  All right.  Ms. Lenahan, if you will, from the plaintiffs' perspective, put on the record why you believe the settlement terms are fair, reasonable, and adequate.  And also, if you will address the fairness and reasonableness of the attorney fee requests, the cost reimbursement request, and the service payment to Mr. Wang.

MS. LENAHAN:  Yes.  Thank you, Your Honor.  With respect to the settlement itself, in plaintiffs' view the settlement is fair, reasonable, and adequate because the 3 million-dollar settlement represents approximately 14 percent of the maximum damages that the class -- that the class suffered in this case were all claims to be proven, and this is well above the 1.8 percent median range of losses to settlement in 2023.  So, this is well above that median.

THE COURT:  Okay.  So, hold on.  So, the 1.18 median is a -- what cohort of class -- all national class actions?  Securities class actions?  Securities class actions within a

11

22-cv-2105-WJM   Fairness Hearing   02-19-2025

range of size of potential recovery?  What are we talking about?

MS. LENAHAN:  The 1.8 percent is a median of all securities class actions in 2023.  And with respect to the damages in this action, which are around 21 million, the losses for the average for those is about 5.1 percent.  So, our 14 percent is higher than the 5.1 percent in our cohort of damages.

THE COURT:  So, what size are we talking about in terms of the group?  Because as I understand your representation, you're not saying that the 1.8 million or the 5.1 million -- the 1.8 percent, rather, and the 5.1 percent are not percentages of all class action settlements; is that correct?

MS. LENAHAN:  That's correct.  It's unique to securities.

THE COURT:  Well, I understand that, but is there a range of potential recoveries that we're talking about?  Have you broken it down, or are we talking about all class action settlements, whether 1 million or one -- or 10 billion?

MS. LENAHAN:  Oh.  I see.  I see your question.  Yes.  There are some exclusions, I think, to avoid the issue that a mega fund might pose to that median.

THE COURT:  Mr. Wilson, would you be able to help us here?

MR. WILSON:  If I'm understanding correctly, we're

Kevin P. Carlin, RMR, CRR

12

22-cv-2105-WJM    Fairness Hearing    02-19-2025

talking about the average --

THE COURT:  Recovery.  Right.  But --

MR. WILSON:  -- security class actions in 2023.

THE COURT:  Right.  But here is the reason for my question.  This is not the first such fairness hearing in securities class action, as you know, because both sides have cited prior orders.  It's more meaningful to me for you to make a representation of 14 percent recovery when you're comparing and contrasting a comparable cohort.  In other words, cases in which the potential maximum discovery is up to 25 million, or between 25 and 50 or 25 and 100 million.  So, what is -- what is the cohort group that you're asking me to compare 14 percent recovery against?

MS. LENAHAN:  So, the cohort group here would be for the specific range of losses here that would implicate our case, which is 21 million.  The range is 20 to 49 million in investor losses, and the average there is 5.1 percent.

THE COURT:  Okay.  So, it's 5.1.  So, your point is that you're about triple what -- the average recovery for that group or cohort of securities class action recoveries?

MS. LENAHAN:  Yes.  That's correct.

THE COURT:  Okay.  I think we've -- I've got my answer.  Okay.  Go ahead, Ms. Lenahan.

MS. LENAHAN:  Yes.  So, in addition to that excellent recovery, this case was settled primarily on the basis of

Kevin P. Carlin, RMR, CRR

13

22-cv-2105-WJM    Fairness Hearing    02-19-2025

Ampio's financial condition.  Ampio was in dire straits before the mediation.  After we filed our amended complaint, it was clear that there was not going to be a lot of money left over to satisfy a judgment.  So, in light of that, lead counsel worked very quickly with defense counsel to come to a resolution that worked for both parties and preserve the available cash and insurance proceeds for the class, who would otherwise have received nothing.

THE COURT:  All right.  And I understand that from your filings.  I should tell you my initial reaction was, oh boy, you had -- you saw where -- that the coffers were running thin quickly, and that we're looking at some kind of fire sale settlement on the part of the plaintiffs.  So, you need to convince me that that's not the case.

MS. LENAHAN:  Oh.  Thank you, Your Honor.  So, here, we had a case where we felt pretty strong on liability, because the -- because of the special committee's release of information concerning the conduct of the Ampion trial that was going on and the unauthorized distribution of the Ampion, the subject drug.  So, we felt confident that going forward, motions to dismiss -- that we would get past the motions to dismiss.  But we were concerned that we would be in a worse position as time went on and defense counsel and the insurance carrier spent money defending the motions to dismiss, there would be even less money to recover.

Kevin P. Carlin, RMR, CRR

14

22-cv-2105-WJM    Fairness Hearing    02-19-2025

THE COURT:  So, I'm assuming, while your case is pending, given the nature of the allegations against the directors and officers, that there must have been a slew of derivative shareholder suits being filed or had been filed; is that accurate?

MS. LENAHAN:  That's correct.

THE COURT:  Okay.  So, you're looking at a vanishing pie in terms of potential source for recovery funds?

MS. LENAHAN:  Exactly.

THE COURT:  All right.  How much advanced or behind this litigation were those derivative shareholder actions?

MS. LENAHAN:  I believe they were a bit behind us. But I'm not sure what the conclusion of those -- of those cases were, or if they're still ongoing.

THE COURT:  Okay.  Go ahead.

MS. LENAHAN:  So, at this point in the settlement approval process, one of the most -- the most important factor that Courts look to is the reaction of the class.  In this case, the reaction has been excellent.  As Your Honor noted, there have been no requests for dissolution and no objections to the settlement or any aspect of it.

In addition, the claims administrator has received over 24,000 claim forms from potential class members and nominees, and this represents about 95 percent of the total number of postcard notices that were mailed out, which in our experience

Kevin P. Carlin, RMR, CRR

22-cv-2105-WJM    Fairness Hearing    02-19-2025

is an extraordinary result.  It's typically a 20 to 30 percent participation rate.  So, the class reaction here strongly favors settlement.

I will go through the four factors that the Tenth Circuit typically looks to as well, and that is -- those overlap with rule 23(e) of the Federal Rules of Civil Procedure.  Here, the first factor is whether the proposed settlement was fairly and honestly negotiated.  Here, I think there can be no question that it was fairly and honestly negotiated.  The parties attended mediation with Robert Meyer, a very experienced mediator.  It was an arm's length negotiation preceded by the exchange of mediation statements.  The parties came to a settlement in -- an agreement in principle during the mediation, subject to defendants providing confirmatory discovery, which included two witness interviews.

THE COURT:  Who were these interviewees?

MS. LENAHAN:  I don't want to speak out of turn, because I believe it's confidential at this time, but we --

THE COURT:  Well, why don't you give me a title or capacity or position that they held.

MS. LENAHAN:  Yes.  So, one of them was a board member who provided information for us on the liability aspects of the case.  And another one, I'm not positive of their title, but they provided information on Ampio's financial position.

THE COURT:  And is their identity confidential because

Kevin P. Carlin, RMR, CRR

16

22-cv-2105-WJM    Fairness Hearing    02-19-2025

of the SEC investigation, or why is it that you can't share that with us?

MS. LENAHAN:  It was confidential pursuant to the mediation confidentiality agreement.  So, I'm not at liberty to share it.  I'm not sure if defendants are at this time.

THE COURT:  Okay.  Go ahead.

MS. LENAHAN:  So, the second factor -- or, sorry.  So when we received the confirmatory discovery and we had the interviews with those two individuals, we were able to review about over 25,000 documents.  And part of the reason we did such a thorough review is because we felt strongly about liability in this case.  So, we wanted to make sure that given what we thought was a case that we could prevail if we went to trial, we wanted to make sure that the facts behind the scenes align with our -- align with what we knew to be true, and whether there were any facts there that would suggest that this is not an appropriate settlement number.

We did not -- we did not find any evidence that the settlement number was too low given the information that we had and considering defendants' financial position.  So, from there, we negotiated the settlement stipulation, and we believe that this was negotiated fairly and honestly.

With respect to the second factor, whether serious questions of law and fact exist placing the ultimate outcome of litigation in doubt, certainly in defendants' view, there are

17

22-cv-2105-WJM    Fairness Hearing    02-19-2025

questions of law and fact that place the ultimate outcome of litigation in doubt. None of their defenses are on the public record, but they were all submitted in the mediation statements and at mediation. And I can tell big picture --

THE COURT: Which you're not privy to?

MS. LENAHAN: Which I am not -- I am not able to describe the defenses in detail at this time, but I can say that our understanding -- and this is consistent with these cases in general -- is that defendants likely would have challenged the materiality of some of the statements. In particular, statements with respect to Ampio's code of ethics, in terms of their following ethical principles and abiding by law. Defendants would likely challenge the materiality of that statement.

In addition to that, defendants also would likely argue that some statements are forward-looking, and protected by the PSLRA safe harbor provision. And defendants also had a myriad likely scienter defenses. For example, the special committee that disclosed the issues with respect to the Ampion trial and the unauthorized use said that no current director -- current executives were involved. So, a few of our defendants are current executives. So, they -- so, their scienter is a bit -- not as clearcut as some other defendants, for example.

Our understanding is that defendants would also likely go after loss causation. We don't think this would be

Kevin P. Carlin, RMR, CRR

18

22-cv-2105-WJM    Fairness Hearing    02-19-2025

successful at the motion to dismiss stage, but it's possible at summary judgment one of our -- one of our loss causation events gets kicked out, and then that affects the damages.

THE COURT:  So, everything you just told me about how you're speculating what the defendants' defenses would be is a product of the fact that this case never advanced to the point that there was any motions practice; isn't that correct?

MS. LENAHAN:  That is correct.

THE COURT:  And yet you didn't even get to the point where there was any pretrial discovery.

MS. LENAHAN:  That is correct.  We did not have pretrial discovery.

THE COURT:  Did you even have a -- did we have a scheduling order entered in this case?

MS. LENAHAN:  I don't believe so, because the discovery stay that the PSLRA requires was in place.  So, I don't believe we had a schedule outside of the motion to dismiss briefing schedule.

THE COURT:  Okay.  So, this is very, very early in the litigation?

MS. LENAHAN:  Yes.

THE COURT:  Go ahead.

MS. LENAHAN:  So, with respect to the third factor, whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive

Kevin P. Carlin, RMR, CRR

22-cv-2105-WJM    Fairness Hearing    02-19-2025

litigation, here we think this factor strongly favors settlement. As previously discussed, Ampio was in dire straits, and the available insurance proceeds were rapidly depleting because of the other litigation it was facing: two derivative cases, state court securities case, and an SEC investigation.

So, we assume that additional -- going forward there would be multiple motions to dismiss filed, because many of the defendants have different counsel. So, we would have to respond to those, and Ampio and the insurance companies would have to pay money to defend those motions to dismiss, which would further diminish the amount of money available. So, we believe here that given the financial condition and the other -- some of the other issues that face liability here, that the immediate recovery far outweighs the value of letting this case go on longer.

With respect to number four, the judgment of the parties that the settlement is fair and reasonable, certainly on plaintiffs' side, lead counsel and plaintiffs believe the settlement is fair and reasonable. And I will say our -- Mr. Wang and his company lost over $3.4 million on their Ampio transactions, and, you know, that is larger than the settlement in this case. And so, you know, he and we thought long and hard about this settlement number, and, you know, the fact that we stand by it in light of his large losses weighs in favor of the settlement.

20

22-cv-2105-WJM    Fairness Hearing    02-19-2025

THE COURT:  All right.  Before you go on to the attorneys' fees, let me ask you, there was a sentence in the settlement agreement that I think even as of right now, I don't fully understand, and I need you to explain it to me.  The settlement agreement states that the plan of allocation for the remaining net settlement fund is not an essential term of the settlement agreement, and does not affect the validity or finality of the proposed settlement.  Can you please explain that to me.

MS. LENAHAN:  Could you point me to the paragraph number?  I'm sorry.

THE COURT:  It is 23.

MS. LENAHAN:  Oh.  Yes.  So, occasionally, not usually, but occasionally, plans of allocations are tweaked by the Court.  Sometimes -- or sometimes objections will make -- will result in changes being made to the plan of allocation. The plan of allocation's fairness, reasonableness, and adequacy is separate from the settlement itself.  And that is how it is usually done in these cases, because my understanding is that we want to have some flexibility with the plan of allocation, because occasionally unanticipated issues arise that require the parties to go back to the drawing board.

THE COURT:  All right.  So, this was an anticipatory clause in case I wanted to red ink some of the terms of the plan of allocation?  Is that what you're telling me?

Kevin P. Carlin, RMR, CRR

22-cv-2105-WJM    Fairness Hearing    02-19-2025

MS. LENAHAN:  Yes.

THE COURT:  So, I don't know how typical that is.  I mean, one of the things that we have to -- we federal judges when we're reviewing these settlements have to consider is there's a line beyond which we can't go in terms of rewriting the settlement agreement, because as you know, the controlling law is that I get -- I have to decide up or down based on the agreement proposed to me, and I don't get to rewrite it and enforce upon the parties a settlement that they had not arrived at.  That's clear, binding, black letter law.

So, actually, it's not the way you characterized it, at least in my experience in this district.  And in comparable and similar settlement agreements, this is not a typical provision. But now that you've explained it, I understand it, and I actually -- I can tell you, I would not make any changes.  I think the -- actually, the plan of allocation is a very equitable one, and is among one of the better plans of allocation that I've seen in these types of cases.

All right.  So, go ahead, and let's talk about the attorneys' fees and costs motion.

MS. LENAHAN:  Thank you, Your Honor.  And I'm glad that the plan of allocation looked good.  It's important to us that it be equitable.  So, thank you.

With respect to the fee motion, lead counsel is seeking an approval of an award of attorneys' fees in the amount of

22

22-cv-2105-WJM     Fairness Hearing     02-19-2025

28 percent of the settlement fund.  That is about $840,000 plus accrued interest.  Lead counsel is also seeking reimbursement of expenses in the amount of $66,475.24 that were reasonably incurred during the course of the action.

With respect to the factors that go to determining whether the percentage requested is reasonable, Courts in this Circuit apply the *Johnson* factors --

THE COURT:  Right.  Which I am very, very familiar with, and you don't have to repeat.  Let me ask you, how much should I consider the fact that the reasonableness of the -- of this amount of the 800 and the 40,000-dollar fee request, that the reasonableness of it is being argued as it compares and contrasts with your lodestar, which is calculated based on East Coast hourly rates, and most definitely not Denver hourly rates?

I mean, I can tell you paralegals in Denver do not bill at 375 an hour.  All right?  So, there's a considerable disparity between the range of fees for all levels, partners, associates, law clerks, paralegals that's in your motion, and that make up -- like I said, your lodestar, what is it?  756k, and that's your main point in terms of, as I read your papers, your main point, the reasonableness of the 840 is that that represents only 1.11 -- 1.11 multiplier.  But how much should I factor into the analysis the fact that these are hourly rates that are completely out of sync with the Denver market?

MS. LENAHAN:  Well, I would say to that, Your Honor,

Kevin P. Carlin, RMR, CRR

23

22-cv-2105-WJM    Fairness Hearing    02-19-2025

that in this Circuit, the lodestar cross check is not required, though I understand that is something that Courts want to look at. In the recent Tenth Circuit case *Voulgaris versus Array Biopharmaceuticals*, the Tenth Circuit was presented with this issue, and it reaffirmed that a lodestar cross check is not required.

And it also -- it also noted that with similar rates in that case, was about $455 an hour for associates to 1,050 for partners, which is very similar to what we have here. The Court noted that while the rates are high for the Denver market, they are consistent with those approved in similar cases. And I submit that that is the case here.

THE COURT: Well, of course the *Johnson* factors, you know, they're decades old and have spawned hundreds of cases -- that decision spawned hundreds of decisions analyzing and interpreting how it should be applied. And it is true that no one factor is dispositive, but from my experience, and how I've ruled previously, the lodestar is a big factor. It's a weightier factor than a host of the other ones, and that was the -- that's what I was getting at.

The concern I had here was the -- not even so much for the partner level. It's the law clerks and paralegals at 350, 375. That's what I think is completely disconnected from the Denver reality. But in any event, apart from the cross check with the lodestar, what would you say is the most -- one or two

Kevin P. Carlin, RMR, CRR

24

22-cv-2105-WJM    Fairness Hearing    02-19-2025

factors that I should be looking at in terms of assessing the appropriateness of the 840,000 award?

MS. LENAHAN:  I would say that one of the most important factors would be the fact that the fee in this case is contingent.  In securities cases, we're subject to what I'm pretty sure is the highest pleading standard of any civil litigation.  I'm not aware of a higher one out there.  So, we take on a great deal of risk taking on these securities cases.

And particularly in a case like Ampio, where in our view, the liability is strong, the damages just aren't that high.  And in order to, you know, incentivize firms to take on cases that may not be mega fund cases, but where investors were really harmed, this -- you know, they take on a huge contingency risk that is in our view beneficial to investors.  So, the contingency risk here, we paid over $60,000 out of pocket to prosecute this action, and we took the risk that we would see none of that money going forward.

We also spent a great deal of time thoroughly investigating the claims in this action, hiring an investigator, and doing all of that groundwork in order to have an amended complaint strong enough that we would be able to withstand any motion to dismiss.  So, the contingency risk here is real.

And were the case to go forward, we have seen cases, you get to summary judgment, you've spent a million dollars in expenses, hiring experts, defending depositions, and you lose,

Kevin P. Carlin, RMR, CRR

25

22-cv-2105-WJM    Fairness Hearing    02-19-2025

and you don't get that money back.  So, the contingency risk in these cases is very high.  So, I would say that's a big factor in our favor.

THE COURT:  Well, I would agree with that.  I think it is an accurate statement that plaintiffs in securities actions have a high bar to clear on a Rule 12.  So, I will grant you that.  Go ahead.

MS. LENAHAN:  Thank you.  And the other one that I think is -- particularly weighs in our favor here is the time and labor expended.  We spent over 1,100 hours on this case, which, you know, is time that we were not precluded from taking on other cases, but it certainly informs the work that we take on going forward knowing that we have to devote resources to a particular case.

And this case, even though we settled early, there was a lot of work to be done in terms of reviewing the confirmatory discovery, in terms of making the best amended complaint that we could, and in terms of coming to an agreement and presenting the settlement before the Court.  So, we think here, that is a big factor in favor of the 28 percent requested.

THE COURT:  Okay.  Let me just say, I think the cost reimbursement request is very reasonable, and the 5,000-dollar service award to Mr. Wang is very reasonable.  It's almost bordering on the nominal.  So, I have no questions about that, unless you want to put something on the record specifically as

Kevin P. Carlin, RMR, CRR

26

22-cv-2105-WJM    Fairness Hearing    02-19-2025

to those two matters.

MS. LENAHAN:  Thank you, Your Honor.  Nothing to add.

THE COURT:  Okay.  My last question for you before I turn to the defendants' counsel is the matter of Mr. Macaluso. It's my understanding that there was -- no substitution of parties ever came about in the case; right?

MS. LENAHAN:  That's correct.

THE COURT:  Okay.  So, what we're dealing here with is the fact that the claims per the settlement agreement, any claims against him or his heirs and affiliates, associates, et cetera, are being released; is that correct?

MS. LENAHAN:  Yes.  That's correct.

THE COURT:  Okay.  And so because of that, it's the plaintiffs' view that it should not concern the Court that there's been no substitution of parties for him?

MS. LENAHAN:  Yes.  Yes, Your Honor.

THE COURT:  All right.  Anything else you want to say about the situation with the deceased defendant?

MS. LENAHAN:  Just, you know, we feel terrible about his tragic passing, and but I think that with respect to the settlement and the release, it does not -- does not complicate matters.

THE COURT:  All right.  But the point here, what I'm driving at is that there will be a final extinguishing of any claims against him so that the matter as to him and his estate

27

22-cv-2105-WJM    Fairness Hearing    02-19-2025

and his heirs has reached a conclusion, is what I'm driving at.

MS. LENAHAN:  Yes.  That's my understanding.

THE COURT:  All right.  Anything else you want to put on the record in support of either of the two motions before me?

MS. LENAHAN:  Nothing further, Your Honor.

THE COURT:  All right.  Thank you.

MS. LENAHAN:  Thank you.

THE COURT:  All right.  Mr. Goldberger, I will ask you to go first.  From the perspective of your clients, please put on the record your views on the reasonableness and fairness of the settlement agreement, the fee request, the cost reimbursement request, and the service award.

MR. GOLDBERGER:  Thank you, Your Honor.  Let me just begin with Your Honor's question about the fire sale, because I think that's obviously the big issue here.  I think we have to set the stage a little bit.  At the time of the settlement conference, not only were there a number of derivative suits, I believe three at the time, but the SEC investigation had ratcheted up.

The way the timing worked out, the lead plaintiff order came out, but by that time the SEC had tremendously ratcheted up its investigation, and there had been hundreds of thousands of documents that were being produced to the SEC.  In addition, there were ten individuals that each required their own counsel because of various conflicts.  And so the insurance money that

28

22-cv-2105-WJM    Fairness Hearing    02-19-2025

was available to pay for all that defense cost was rapidly being exhausted. This was a wasting policy, and so the money was just disappearing incredibly quickly.

THE COURT: I can imagine, in these circumstances.

MR. GOLDBERGER: Yes, Your Honor. And in addition, I think this case has one unique aspect that we did inform plaintiffs' counsel about, and in fact have informed the SEC about. There is in this case very unusually an enormous advice of counsel defense. There were a number of decisions and consultations related to the actual disclosures that were made at the time that are the subject of the plaintiffs' complaint. It would have been our position that all of those had been made with the explicit advice of counsel, thus negating scienter.

And while we may not have been able to prove that at the time of a motion to dismiss, it certainly would have become the topic of discovery and then a summary judgment motion. And so that factored heavily into, I think, both sides' decision-making. And I will tell you that at this stage --

THE COURT: And that point was communicated via the mediator to plaintiffs?

MR. GOLDBERGER: Via the mediator. We communicated that via Mr. Meyer, and told him that that's where we were headed, and we were told that he passed that on.

THE COURT: All right.

MR. GOLDBERGER: So, I think that factored into this

29

22-cv-2105-WJM    Fairness Hearing    02-19-2025

whole consideration. I can also tell Your Honor that at this stage, the company is almost out of money. It is in dissolution. It has announced that it will go into dissolution. We are frankly waiting for hopefully approval of this settlement and an accompanying derivative settlement in two months, because in order to file the dissolution papers in Delaware, we have to be able to state that we don't have any outstanding claims. And so that's what we're waiting for, but at that point we will go into dissolution. So, in fact the concern that there wouldn't even be an entity there turned out to be accurate.

And I can also tell Your Honor that we're almost out of insurance money. So, at this stage, there's almost nothing left. So, in terms of it being a fire sale, perhaps, but the class would have wound up with nothing if we had proceeded all through discovery, because there would have been no money at all available for the class. It all would have been exhausted in the proceedings themselves.

So, from my point of view, those two factors, the lack of cash and the unique advice of counsel defense is what counsel is approving this settlement as fair and reasonable.

THE COURT: All right. Do you wish to be heard on the fee and costs motion?

MR. GOLDBERGER: Your Honor, we have no objection to the fee. We have nothing more to say on that.

THE COURT: All right. Thank you. I want to give

30

22-cv-2105-WJM    Fairness Hearing    02-19-2025

whichever other defense counsel the opportunity to take the lectern and speak on behalf of their clients.  Ms. Garnett?

MS. GARNETT:  Thank you, Your Honor.  In addition to the points that Mr. Goldberger just raised, I would note that as it related to Ms. Cherevka, the fair and reasonableness of the settlement is really embodied in the mediation that she participated in on behalf -- as me as her counsel, we submitted a 22-page mediation statement that was confidentially shared with the parties.

We laid out the defenses that we would assert if we were to get to discovery, but really our eyes were on the SEC investigation and making sure that there were sufficient proceeds to be able to defend Ms. Cherevka in that investigation.

THE COURT:  Okay.

MS. GARNETT:  Thank you.

THE COURT:  Thank you.  Mr. Hoffman?

MR. HOFFMAN:  Thank you, Your Honor.  From Dr. Bar-Or's point of view, I agree with everything my co-counsel -- all the co-defense counsel have said.  I just underscore that Dr. Bar-Or denies any liability, and the settlement embodies that, and we would indeed intend to litigate and defend the case vigorously, you know, with multiple defenses, as other counsel has been noted.  But of course there's always risk in any litigation, and Dr. Bar-Or at this

Kevin P. Carlin, RMR, CRR

22-cv-2105-WJM    Fairness Hearing    02-19-2025

point in his life and career really would like to just put everything behind him. So, on balance, the settlement is a fair and reasonable settlement considering those factors from his own personal point of view.

THE COURT: All right. Thank you.

MR. HOFFMAN: Thank you.

THE COURT: All right. Addressing specifically the issue of objections, I note again that no objections were filed by the deadline that I set in my preliminary approval order, that deadline being January 29th of this year. No objections were received, and I will note for the record that apart from counsel, my staff, and I, there are no other individuals present in the courtroom right now to make an objection on the record.

One second. All right.

I intend to enter in the very near future a written order fully setting forth the bases for my decision, but I will briefly summarize my intended rulings at this time.

I find that the settlement negotiated by counsel is fair, reasonable, and adequate, and I will grant lead plaintiff's motion for final approval of the class action settlement filed at ECF 100.

The parties have shown to me to my satisfaction that the settlement agreement was negotiated at arm's length by counsel that is experienced in litigating these type of security class action cases. The settlement assures that the class

32

22-cv-2105-WJM     Fairness Hearing     02-19-2025

members will receive reasonable compensation in light of the uncertainties of litigating to a judgment.  It also provides a significant immediate benefit to the class, and avoids protracted litigation over these disputes.  The fact that no class member has objected to the settlement, and no class member has requested exclusion from the class settlement shows to me that the class members consider this settlement to be fair and reasonable.  All of these factors support my finding that the settlement agreement is fair, adequate, and reasonable, and it will be approved.

I also intend to grant lead counsel's motion for an award of attorneys' fees, reimbursement of expenses, and award to lead plaintiff, filed at ECF 100.  I find that the requested amount of fees and costs is reasonable considering the effort expended on this case by class counsel, the risk and difficulties inherent in this sort of litigation, the skill required, and the dedication displayed over the litigation of this matter.

The requested attorneys' fee award, which is approximately 28 percent of the total settlement amount, is in fact in line with awards granted in other contingency cases by this Court and other Courts and other judges in this district. The actual costs incurred, in my view, are also reasonable in light of the scope of the representation.  Thus, I approve the attorneys' fees and costs reimbursement as requested.

Kevin P. Carlin, RMR, CRR

33

22-cv-2105-WJM    Fairness Hearing    02-19-2025

Finally, I approve the service payment award of $5,000 to named plaintiff Tao Wang.  I find this amount to be reasonable given plaintiff Wang's relative participation in the case.  The amount requested is also in my view reasonable as compared to the size of the overall recovery.

All right.  I have covered everything I need to cover in this hearing.  Are there any other matters from the plaintiffs' perspective that we need to address this morning?

MS. LENAHAN:  I have nothing further, Your Honor.  Thank you.

THE COURT:  All right.  Thank you.  Anything further from any of the defense counsel?

MR. GOLDBERGER:  Nothing further, Your Honor.

MR. COMPTON:  No, Your Honor.  Thank you.

THE COURT:  Thank you, folks.  That will be it.

(Proceedings concluded at 11:26 a.m.)

Kevin P. Carlin, RMR, CRR

REPORTER'S CERTIFICATE


     I, KEVIN P. CARLIN, Official Court Reporter for the United States District Court for the District of Colorado, a Registered Merit Reporter and Certified Realtime Reporter, do hereby certify that I reported by machine shorthand the proceedings contained herein at the time and place aforementioned and that the foregoing pages constitute a full, true, and correct transcript.

          Dated this 25th day of February, 2025.




                                        _____
                                        Kevin P. Carlin, RMR, CRR
                                        Official Court Reporter












                    Kevin P. Carlin, RMR, CRR